**REESE LLP**
Michael R. Reese
100 West 93rd Street, 16th Floor
New York, New York 10025
Telephone: (212) 643-0500
*mreese@reesellp.com*

Kevin Laukaitis (*pro hac vice* to be filed)
*klaukaitis@laukaitislaw.com*
**LAUKAITIS LAW LLC**
954 Avenida Ponce De Leon
Suite 205, #10518
San Juan, PR 00907
Telephone: (215) 789-4462

*Counsel for Plaintiff
and the Proposed Class*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ARTHUR VARGAS, *individually and on behalf of all others similarly situated*,<br><br>Plaintiff,<br><br>v.<br><br>BARCLAYS BANK DELAWARE,<br><br>Defendant. | Case No.:  24-cv-6549<br><br>**CLASS ACTION COMPLAINT**<br><br>**<u>DEMAND FOR JURY TRIAL</u>** |

Plaintiff Arthur Vargas ("Plaintiff"), on behalf of himself and all other similarly situated ("Class Members"), brings this case against Barclays Bank Delaware ("Barclays" or "Defendant"). Plaintiff brings this action based upon personal knowledge of the facts pertaining to himself, and on information and belief as to all other matters, by and through the investigation of undersigned counsel.

## INTRODUCTION

1.      This is a class action lawsuit against Barclays Bank for: (i) its unlawful disclosure of Plaintiff's personally identifiable information ("PII") (including information that identifies a person as having requested or obtained products or services) to a third party, Meta Platforms, Inc., formerly known as Facebook, Inc. ("Meta" or "Facebook"), and (ii) Defendant's retention of records containing PII concerning Plaintiff and the Class Members.

2.      Barclays is a major global financial services provider engaged in retail banking, credit cards, corporate and investment banking, and wealth management. Barclays moves, lends, invests, and protects money for 48 million customers and clients worldwide.

3.      Barclays's online banking website—www.banking.barclaysus.com—allows consumers to access their account information. Barclays monitors and records its customers' interaction with its website while they are logged on to access their confidential account information.

4.      Barclays shares customer interactions through its website with Meta, which owns the social networking website and app Facebook. Barclays discloses this information to Facebook using the Meta Pixel ("Pixel"), a snippet of programming code Barclays chose to install on its website that sends information about its users to Facebook. In this case, the information shared with Facebook includes (a) the fact that the individual is or has been one of Barclays's customers

or has obtained a financial product or service from Barclays; and (b) information related to applications to obtain a credit card or other financial products or services, and information Barclays obtains in connection with servicing its customers' accounts.

5.      Meta utilizes a combination of the personal information obtained from Barclays's website about each consumer and other information gathered from different sources for marketing and advertising purposes.

6.      Under the Gramm–Leach–Bliley Act (GLBA), 15 U.S.C. §§ 6801, et seq., financial institutions, such as Barclays, are prohibited from disclosing a consumer's "personally identifiable financial information" without advance notification and opt-out rights. The GLBA defines "personally identifiable financial information" to include, among other things, (a) any information a consumer provides to a financial institution to obtain financial products or services (b) any information about a consumer resulting from any transaction involving a financial product or service; or (c) any information a financial institution otherwise obtains about a customer in connection with providing a financial product or service. The examples of "personally identifiable financial information" included in the GLBA are indistinguishable from the types of information Barclays disclosed to Meta, including, among other things: (a)"[t]he fact that an individual is or has been one of [a financial institution's] customers or has obtained a financial product or service from [a financial institution]"; (b) "[a]ny information that a consumer provides to [a financial institution] or that [a financial institution] or [its] agent otherwise obtain[s] in connection with collecting on, or servicing, a credit account; and (c) "any information [a financial institution] collect[s] through an Internet 'cookie'(an information collecting device from a web server)."

7.      Barclays's practice of disclosing its customers' personal financial information to Meta violated Plaintiff's and other Class Members' privacy rights under the GLBA. Barclays's

conduct also violated other related federal and state laws. Plaintiff brings this action, individually and on behalf of all others similarly situated, for damages and equitable relief.

## THE PARTIES

8.     Plaintiff Arthur Vargas resides in the Bronx, New York. Plaintiff is a user of Barclays's website and has used Barclays' website on the same browsers and devices that he logs into Facebook with, where he has an account.

9.     Defendant Barclays Bank Delaware is a corporation with its principal place of business at 125 South West Street, Wilmington, Delaware. Defendant operates a website which allows consumers to access their account information through which it collects and retains the PII of its consumers, and discloses their PII to third party, Facebook.

## JURISDICTION AND VENUE

10.     This Court has original subject matter jurisdiction over this class action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367.

11.     The Court also has original subject matter jurisdiction over this putative class action pursuant to the Class Action Fairness Act of 2005, under 28 U.S.C. § 1332(d), because: Plaintiff is a citizen of New York and Defendant is a citizen of Delaware; the matter in controversy is well in excess of $5,000,000 in the aggregate, exclusive of interest and costs; and "the number of members of all proposed plaintiff classes in the aggregate" is greater than 100, *see* 28 U.S.C. § 1332(d)(5)(B).

12.     The Court has personal jurisdiction over Defendant because Plaintiff's claims against Defendant arise out of its conduct within New York, including Plaintiff's use in New York of the Barclays website to access their financial account information and apply for financial products.

13.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District, where Plaintiff resides and used Barclays's website to access their financial account information.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

I.    **Barclays' Disclosure of the PII of Plaintiff and the Class Members to Facebook**

A.    **Barclays Designed Its Website to Disclose Users' PII to Facebook, Including the Financial Information or Personal Information They Share With Barclays**

14.    Barclays operates a website in the U.S., accessible from a desktop or mobile device at https://www.banking.barclaysus.com or from a handful of applications and devices, such as the Barclays Bank US Savings and Barclays Bank US Credit Cards apps, through which consumers can access Barclays account information.

15.    The Meta Pixel, formerly referred to as the Facebook Pixel, was first introduced in 2013 and allows online businesses like Barclays to build detailed profiles about its users by collecting information about how they interact with their websites and facilitates the service of targeted advertising to them.

16.    The Meta Pixel is a piece of code that companies like Barclays can integrate into their website. Once activated, the Meta Pixel tracks people and the types of actions they take on the website. When the Meta Pixel captures an action, it sends a record to Facebook. Facebook then processes this data, analyzes it, and assimilates it into datasets like Core Audiences and Custom Audiences that allows any advertiser to use for ad targeting.

17.    To take advantage of Facebook's targeted advertising and analytical services, Barclays intentionally installed the Meta Pixel on its website, thus making the knowing choice to track consumers' PII and send it to Facebook.

18.    Companies like Barclays control what actions—or "events"—the Meta Pixel will collect, including the website's metadata, along with what pages a visitor views and what buttons a visitor clicks. Companies can also configure the Meta Pixel to track other events. Facebook offers a menu of "standard events" from which advertisers can choose, including what content a visitor views or purchases. A company can also create their own tracking parameters by building a "custom event."

19.    Companies like Barclays control where and how the Meta Pixel identifies visitors. The Meta Pixel is configured to automatically collect "HTTP Headers." HTTP Headers collect IP addresses, information about the web browser, page location, document, referrer and persons using the website.

20.    When a user accesses barclaysus.com while logged into Facebook, the Pixel will compel that user's browser to transmit the c_user cookie, which contains the user's unencrypted Facebook ID. Facebook IDs correspond to Facebook profiles. Facebook also receives the fr and Datr cookies from a visitor's browser when visiting barclaysus.com. The fr and Datr cookies contain, at least, an encrypted Facebook ID and browser identifier. The c_user cookie contains, at least, an unencrypted value that uniquely identifies a browser.

21.    The information Facebook collects from the Meta Pixel is valuable to both Meta and Barclays Bank. Meta uses this information to enhance its advertising services, improve user profiling, and develop new products. Specifically, Meta: a. Use the data to promote safety and security on Meta products; b. Conduct research and development to improve Meta products; c. Create custom audience sets that can be shared with other advertisers; d. Use the event data for ad delivery after aggregating it with other data; e. Help websites like Barclays Bank reach people with transactional and commercial messages on Facebook Messenger and other Meta products; f.

Personalize features and content (including ads) shown to people on and off Meta products.

22.    For Barclays Bank, the Meta Pixel enables more effective targeted advertising, provides valuable customer insights, and allows for better measurement of marketing campaign effectiveness. This data sharing arrangement benefits both companies financially by increasing ad revenue and customer acquisition, while compromising consumers' privacy rights.

**B.    How Barclays Discloses Digital Consumers' PII to Facebook**

23.    Businesses have the option of installing the Meta Pixel on their websites. Doing so enables the business to collect information about how users interact with the business's website, such as whether they initiate purchases on the website, what items they spend time viewing, and, as relevant here, the  content the users request or obtain on a particular webpage.

24.    The Meta Pixel is a unique string of code businesses can embed on their websites, allowing them to track consumers' actions and report the actions back to Facebook.

25.    The Pixel can follow a consumer to different websites and across the Internet even after clearing browser history.

26.    The Pixel allows Facebook to build detailed profiles about a website's users as those users browse the web in order to serve targeted advertisements to those users.

27.    To take advantage of advertising and information services offered by Facebook, Barclays programmed the Barclays website to include a Meta Pixel.

28.    When a Barclays consumer requests, obtains, or shares information on Barclays's website, the Pixel installed by Barclays sends Facebook certain information about the consumer.

29.    With regard to Barclays Bank customer identities, Barclays Bank transmits to Meta via the Facebook Tracking Pixel information captured by multiple cookies that identify individual Barclays Bank customers. The key cookies involved are:

a.  The "c_user" cookie: This cookie contains an unencrypted Facebook ID, which is a unique and persistent numerical identifier - similar to a social security or driver's license number - that Meta assigns to each Facebook user. This ID allows: (a) Meta to directly identify the specific individual associated with the Facebook ID; and (b) anyone to identify the specific individual by appending the Facebook ID to https://facebook.com/[Facebook ID]. The data sent to Meta by Barclays Bank included these unencrypted Facebook IDs of Barclays Bank customers using the Barclays Bank website;

b.  The "fr" cookie: This cookie contains an encrypted Facebook ID and browser identifier. While encrypted, this information still allows Meta to link the browsing session to a specific Facebook user; and

c.  The "Datr" cookie: This cookie contains a unique browser identifier. While it doesn't directly contain a Facebook ID, it allows Meta to recognize the same browser across multiple visits and sessions, which can be correlated with other data to identify specific users.

30.     In addition to these cookies, Barclays Bank also disclosed to Meta other data (including information identifying the customer's web browser, IP address, and browsing behavior on Barclays' site) that Meta can use in combination with the cookie data to determine the identity of the individual Barclays Bank customer accessing the Barclays Bank website.

31.     The combination of these cookies and additional data allows Meta to directly link Barclays Bank website activity to specific, identified individuals, thereby revealing their identity and directly relating financial information to them. This level of identification goes beyond mere anonymous tracking and constitutes a disclosure of personally identifiable information.

32.     With respect to the actions Barclays customers take on the Barclays website, Barclays discloses at least the following types of event data to Meta alongside information identifying the specific Barclays customer: The Deposit Page View, BarclaycardUSPageView, BarclaysDepositsSavingsLPView, CDLandingPageView/Page View, DepositsPageView, and

SavingsLandingPageView events transmit the URL accessed, revealing which webpage the visitor viewed.

33.     The Pixel sends the full URL path to Meta, including details about specific financial product pages or application steps the consumer has navigated to. For example, during an application, this includes the URLs describing the landing page, personal information page, contact details page, and programmed events that are fired when visiting the page.

34.     The events transmit data showing the exact financial product (e.g. a specific Barclays card, investment product, or savings account) that the consumer obtains.

35.     Barclays could easily program its website so that this information is not disclosed to Facebook or update disclosures to inform consumers that information that is obtained is shared with third parties and they can opt-out.

36.     At all relevant times, Barclays knew that the Meta Pixel disclosed PII to Facebook, identifying its consumers. This is evidenced from, among other things, the functionality of the Pixel, including that the Pixel's sharing of information with Facebook enabled Barclays's website to show targeted advertising to its digital consumers based on the products those digital consumers had requested or obtained on the website.

## II.     The Information Barclays Shared Is Protected Under The Gramm-Leach-Bliley Act & Related Regulations.

37.     The GLBA defines a financial institution as "any institution the business of which is engaging in financial activities as described in Section 1843(k) of Title 12 [The Bank Holding Company Act of 1956]." 15 U.S.C. § 6809(3)(A).

38.     Barclays is a financial institution, as that term is defined by Section 509(3)(A) of the GLBA, 15 U.S.C. § 6809(3)(A), and thus is subject to the GLBA.

39.     Pursuant to the GLBA, "each financial institution has an affirmative and continuing

obligation to respect the privacy of its customers and to protect the security and confidentiality of those customers' nonpublic personal information." 15 U.S.C. § 6801(a).

40.     Pursuant to the regulations implementing the GLBA:

a.      "[n]on public personal information" means (i) "[p]ersonally identifiable financial information", and (ii) "[a]ny list, description, or other groupings of consumers (and publicly available information pertaining to them) that is derived using any personally identifiable financial information that is not publicly available", 16 C.F.R. § 313.3(n); 12 CFR § 1016.3(p);

b.      "personally identifiable financial information," in turn, means "any information: (i) [a] consumer provides to [a financial institution] to obtain a financial product or service from [a financial institution], (ii) [a]bout a consumer resulting from any transaction involving a financial product or service between [a financial institution] and a consumer, or (iii) [a financial institution] otherwise obtain[s] about a consumer in connection with providing a financial product or service to that consumer," 16 C.F.R. § 313.3(o)(1); 12 CFR § 1016.3(q)(1); and

c.      specifically enumerated "examples" of types of information that qualifies as "personally identifiable financial information" include, among other things: (i) "[t]he fact that an individual is or has been one of [a financial institution's] customers or has obtained a financial product or service from [a financial institution," (ii) "[a]ny information about [a financial institution's] consumer if it is disclosed in a manner that indicates that the individual is or has been [a financial institution's] consumer," (iii) [a]ny information that a consumer provides to [a financial institution] or that [a financial institution] or [its] agent otherwise obtain[s] in connection with collecting on, or servicing, a credit account," and (iv) "[a]ny information [a financial institution] collect[s] through an Internet 'cookie' (an information collecting device from a web server)," 16 C.F.R. § 313.3(o)(2); 12 CFR § 1016.3(q)(2).

41.     The information that Barclays disclosed to Meta via the Facebook Tracking Pixel is considered "nonpublic personal information" under the GLBA and related regulations.

**III.  Barclays's Disclosure Of Plaintiff's Non-Public Personal Information Was Unlawful.**

42.     Pursuant to the regulations implementing the GLBA, financial institutions may not, directly or through an affiliate, disclose any "non-public personal information" about a consumer to a non-affiliated third party unless, among other things: (a) the financial institution provides the

consumer with a clear and conspicuous notice that accurately reflects the financial institution's privacy policies and practices; and (b) the consumer does not opt out of those data sharing practices and clear, conspicuous and accurate disclosure. 16 C.F.R. § 313.10(a)(1); 12 C.F.R. § 1016.10(a)(1).

43.    As noted above, the notice to consumers regarding the financial institution's privacy policies and practices must be "clear and conspicuous" and "accurately reflect[]" the financial institution's privacy policies and practices. 16 C.F.R. §§ 313.4 and 313.5; 12 C.F.R. §§ 1016.4 and 1016.5. The notice must include specified elements, including the categories of non-public personal information the financial institution collects and discloses, the categories of third parties to whom the financial institution discloses the information, and the financial institution's security and confidentiality policies and practices for non-public personal information 16 C.F.R. § 313.6; 12 C.F.R. § 1016.6. The notice must be provided "so that each consumer can reasonably be expected to receive actual notice." 16 C.F.R. § 313.9; 12 C.F.R. § 1016.9.

44.    Barclays fails to provide the required "clear and conspicuous" notice that "accurately reflects" its privacy policies and practices. In fact, Barclays's notice to consumers regarding its data sharing states that it does not share information with non-affiliates for marketing purposes. However, the use of the Facebook pixel is considered sharing information with Facebook (a non-affiliate) for marketing purposes. Within the meaning of the GLBA and related regulations, Meta is not an affiliate of Barclays and is otherwise a nonaffiliate of Barclays. Because the Privacy Notice does not comply with the applicable regulations described above, Barclays was prohibited from disclosing its customers' non-public personal information collected through the Facebook TrackingPixel, and those disclosures were unlawful under the GLBA and related regulations. Furthermore, Barclays' privacy notice contains misleading and inaccurate statements regarding the

sharing of customer information. The notice falsely claims that Barclays "does not reveal your specific identity or does not directly relate to an individual, such as:...Information collected through cookies, pixel tags and other technologies." This statement is demonstrably untrue, as the Meta tracking Pixel installed on Barclays' website does, in fact, collect and transmit information that can be linked to specific identity or individual, including the C_user, FR, and Datr their cookies which contain the Facebook IDs and detailed browsing behavior from Barclays' financial pages. Moreover, the notice fails to adequately disclose the extent and nature of information sharing with third parties like Meta, omitting crucial details about the use of tracking technologies and the potential for this data to be used for marketing purposes. This lack of transparency and accuracy in Barclays' privacy disclosures constitutes a material misrepresentation to customers and a violation of their reasonable expectations of privacy when engaging with a financial institution.

45.     By disclosing Plaintiff's and Class Members' non-public personal information to Meta without the required notice, Barclays violated 16 C.F.R. § 313(the "GLBA Privacy Rule")and 12 C.F.R. § 1016 ("Regulation P").Barclays' use of the Meta Pixel to share customers' nonpublic personal information and online banking activities with Facebook violates the Gramm-Leach-Bliley Act's restrictions on disclosing consumers' nonpublic personal information to unaffiliated third parties.

## IV. Barclays's Conduct Was "Unfair" Under The Federal Trade Commission Act.

46.     The GLBA "Privacy Rule" became effective on July 1, 2001. 16 C.F.R. § 313.

47.     The Federal Trade Commission ("FTC") has interpreted Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45, to include compliance with the GLBA Privacy Rule.

48.     Failing to comply with the GLBA Privacy Rule is an unfair act or practice prohibited by Section 5 of the FTC Act.

## PLAINTIFF'S EXPERIENCE

49.     Plaintiff Arthur Vargas is a Barclays Bank website user as well as a Facebook user.

50.     Plaintiff has been accessing Barclays Bank's website regularly on a weekly basis in order to pay his bills.

51.     Plaintiff joined Facebook almost two decades ago, and has had a Facebook account during the entirety of his time as a Barclays Bank consumer.

52.     Plaintiff visited Barclays Bank website to provide and receive personal and financial information using the same browser that he uses to log in to Facebook, including while he was logged in to Facebook.

53.     Barclays Bank disclosed to Facebook Plaintiff's personal and financial information, including any information related to items Plaintiff shared with Barclays in anticipation of applying for a bank account or some other credit with them.

54.     Plaintiff requests and obtains information regarding finances from Barclays Bank, and Barclays Bank maintains records of Plaintiff's search history and input history to this end.

55.     Plaintiff was unaware that their browsing activity on Barclays' website, including the specific products they viewed and the information they provided, was being transmitted to Facebook via the Meta Pixel.

56.     Had Plaintiff known that Barclays was sharing their personal information and browsing activity with Facebook, they would not have interacted with Barclays' website or provided any personal information.

57.    Plaintiff has since received targeted advertisements on Facebook for Barclays products similar to those they researched, indicating that their personal information and browsing activity was indeed captured and used for marketing purposes.

58.    Barclays' unauthorized disclosure of Plaintiff's personal information and browsing activity to Facebook has caused Plaintiff anxiety, frustration, loss of the confidentiality of the stolen confidential data, and concern about their privacy, as well as the time and effort spent monitoring their online presence for potential misuse of their information.

59.    Barclays Bank retains Plaintiff's PII for longer than necessary for the purpose for which it was collected, in violation of State law and the GBLA. Barclays Bank did not destroy Plaintiff's PII as soon as practicable. Barclays Bank did not even destroy Plaintiff's PII within one year from the date the information was no longer necessary for the purpose for which it was collected. Indeed, on information and belief, Barclays Bank is retaining Plaintiff's PII indefinitely.

## CLASS ACTION ALLEGATIONS

60.    Pursuant to Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, Plaintiff brings this action on behalf of himself and a proposed class ("Nationwide Class") defined as follows:

> All persons in the United States who, within the applicable limitations period, (1) had a Facebook account; and (2) interacted with Barclay Bank's online financial platform at https://www.banking.barclaysus.com within the authenticated Barclays Bank financial platform.

61.    Plaintiff also brings this action on behalf of a New York subclass ("New York Subclass") defined as follows:

> All persons in the New York who, within the applicable limitations period, (1) had a Facebook account; and (2) interacted with Barclay Bank's online financial platform at https://www.banking.barclaysus.com within the authenticated Barclays Bank financial platform.

62.     Unless otherwise specified below, the Nationwide Class and New York Subclass are referred to collectively below as the "Class."

63.     Excluded from the Class are: (a) Defendant, Defendant's board members, executive-level officers, and attorneys, and immediately family members of any of the foregoing persons; (b) governmental entities; (c) the Court, the Court's immediate family, and the Court staff; and (d) any person that timely and properly excludes himself or herself from the Class in accordance with Court-approved procedures.

64.     Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of her claims on a class-wide basis using the same evidence as individual Class Members would use to prove those elements in individual actions alleging the same claims.

65.     **Numerosity.** The size of the Class is so large that joinder of all members of the Class is impracticable. The exact number of Class Members is unknown, but Barclays represents it has over 20 million consumers[1] and Plaintiff estimates there are, at least, many thousands of consumers in the New York alone.

66.     **Commonality and Predominance.** There are questions of law and fact common to the Class. These questions predominate over any questions affecting only individual Class Members. Predominating common questions include but are not limited to:

a.     whether Defendant engaged in the conduct alleged herein;

b.     whether Defendant knowingly disclosed Plaintiff's and Class Member's PII to Facebook;

---

[1] https://home.barclays/investor-update-2024/#:~:text=We%20are%20proud%20to%20have,world's%20largest%20credit%20card%20market. (last accessed August 26, 2024)

c.    whether Defendant retained records of PII for Plaintiff and the Class Members for longer than necessary for the purpose for which it was collected;

d.    whether Defendant's conduct violates the GBL;

e.    Whether Defendant's disclosure of Plaintiff's and Class Members' nonpublic personal information to third-parties violated federal, state, and local laws or industry standards;

f.    Whether Defendant owed duties to Plaintiff and Class Members to protect their nonpublic personal information;

g.    whether Defendant was unjustly enriched by its conduct;

h.    whether Plaintiff and the Class Members consented to Defendant's disclosure of their nonpublic personal information; and

i.    whether Plaintiff and the Class Members are entitled to actual, statutory, or other forms of damages and other monetary relief; and

j.    whether Plaintiff and the Class Members are entitled to equitable relief, including but not limited to injunctive relief and equitable restitution.

67.    Defendant engaged in a common course of conduct in contravention of the laws Plaintiff seeks to enforce individually and on behalf of the Class Members. Similar or identical statutory and common law violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action. Moreover, the common questions will yield common answers.

68.    **Typicality.** Plaintiff's claims are typical of the claims of the Class Members because Defendant injured all Class Members through the uniform misconduct described herein; Barclays knowingly disclosed the PII of Plaintiff, the Class Members to Facebook as described

herein; Barclays unlawfully retained Plaintiff's and the Class Members' PII as described herein; and Plaintiff seeks the same relief as all Class Members.

69.     Furthermore, there are no defenses available to Defendant that are unique to Plaintiff.

70.     **Adequacy of Representation.** Plaintiff is a fair and adequate representative of the Class because Plaintiff's interests do not conflict with the Class Members' interests. Plaintiff will prosecute this action vigorously and is highly motivated to seek redress against Defendant. Furthermore, Plaintiff has selected competent counsel that are experienced in class actions and other complex litigation. Plaintiff and her counsel are committed to prosecuting this action vigorously on behalf of the Class and have the resources to do so.

71.     **Injunctive and Declaratory Relief.** The requirements for maintaining a class action pursuant to Rule 23(b)(2) are met, as Defendant has acted or refused to act on grounds generally applicable to each of the Classes, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to each Class as a whole.

72.     **Superiority.** The class action mechanism is superior to other available means for the fair and efficient adjudication of this controversy for reasons including but not limited to the following:

a.      The damages individual Class Members suffered are small compared to the burden and expense of individual prosecution of the complex and extensive litigation needed to address Defendant's conduct.

b.      Further, it would be virtually impossible for the Class Members individually to redress effectively the wrongs done to them. Even if Class Members themselves could afford such individual litigation, the court system could not. Individualized litigation would

unnecessarily increase the delay and expense to all parties and to the court system and presents a potential for inconsistent or contradictory rulings and judgments. By contrast, the class action device presents far fewer management difficulties, allows the hearing of claims which might otherwise go unaddressed because of the relative expense of bringing individual lawsuits, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

c.     The prosecution of separate actions by the individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant.

d.     The prosecution of separate actions by individual Class Members would create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of other Class Members not parties to the adjudications or that would substantively impair or impede their ability to protect their interests.

73.     **Notice.** Plaintiff and her counsel anticipate that notice to the proposed Classes will be effectuated through recognized, Court-approved notice dissemination methods, which may include United States mail, electronic mail, Internet postings, and/or published notice.

## CLAIMS FOR RELIEF

### COUNT I
### NEGLIGENCE
**(On Behalf of Plaintiff and the Nationwide Class)**

74.     Plaintiff repeats and re-alleges the above paragraphs as if fully alleged herein.

75.     Plaintiff and Class Members submitted sensitive nonpublic personal information, including personally identifiable financial information, when accessing Barclays's online financial platform.

76.     By collecting, storing, using, and profiting from this data, Barclays had a duty of care to Plaintiff and Class Members to exercise reasonable care in keeping their nonpublic personal information, including personally identifiable financial information, confidential.

77.     Barclays had common law duties to prevent foreseeable harm to Plaintiff and Class Members. These duties existed because Plaintiff and Class Members were the foreseeable and probable victims of any disclosure of their nonpublic personal information, including personally identifiable financial information, without their consent.

78.     Defendant's duties to protect the confidentiality of Plaintiff's and Class Members' nonpublic personal information, including personally identifiable financial information, also arose as a result of the special relationship that existed between Defendant, on the one hand, and Plaintiff and Class Members, on the other hand. The special relationship arose because Plaintiff and Class Members entrusted Defendant with their nonpublic personal information, including personally identifiable financial information, in connection with using Defendant's financial services. Defendant alone could have ensured that it did not disclose nonpublic personal information, including personally identifiable financial information, without its consumers' consent.

79.     Defendant's duties to keep the nonpublic personal information, including personally identifiable financial information, confidential also arose under Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including the unfair practice of failing to keep the nonpublic personal information confidential.

80.     Barclays's duty to keep nonpublic personal information, including personally identifiable financial information, confidential also arose under the GLBA, under which Barclays was required to keep nonpublic personal information, including personally identifiable financial information, confidential.

81.     Defendant knew or should have known that by integrating the tracking technologies like the Facebook Tracking Pixel on Barclays's website that Plaintiff's and Class Members' nonpublic personal information, including personally identifiable financial information, would be disclosed to Meta.

82.     Defendant breached the duties it owed to Plaintiff and Class Members described above and was thus negligent. Defendant breached these duties by, among other things, installing the Facebook Tracking Pixel on its website, and configuring the Facebook Tracking Pixel in such a way that it systematically disclosed Defendant's customers nonpublic personal information, including personally identifiable financial information, to an unaffiliated third party.

83.     But for Defendant's wrongful and negligent breach of the duties it owed to Plaintiff and Class Members, their nonpublic personal information, including personally identifiable financial information, would not have been disclosed without their consent.

84.     As a direct and proximate result of Defendant's negligence, Plaintiff and Class Members have been injured and are entitled to damages in an amount to be proven at trial.

85.     Plaintiff and Class Members seek to recover the value of the unauthorized access to their PII resulting from Defendants' wrongful conduct. This measure of damages is analogous to the remedies for unauthorized use of intellectual property. Like a technology covered by a trade secret or patent, use or access to a person's personal information is non-rivalrous—the unauthorized use by another does not diminish the rights-holder's ability to practice the patented invention or use the trade-secret protected technology. Nevertheless, a plaintiff may generally recover the reasonable use value of the IP—i.e., a "reasonable royalty" from an infringer. This is true even though the infringer's use did not interfere with the owner's own use (as in the case of a non-practicing patentee) and even though the owner would not have otherwise licensed such IP to the infringer. A similar royalty or license measure of damages is appropriate here under common law damages principles authorizing recovery of rental or use value. This measure is appropriate because (a) Plaintiff and Class Members have a protectable property interest in their PII; (b) the minimum damages measure for the unauthorized use of personal property is its rental value; and (c) rental value is established with reference to market value, i.e., evidence regarding the value of similar transactions.

### COUNT II
### NEGLIGENCE PER SE
**(On Behalf of Plaintiff and the Nationwide Class)**

86.     Plaintiff repeats and re-alleges the above paragraphs, as if fully alleged herein.

87.     Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce" including the unfair act or practice by Defendant of failing to keep nonpublic personal information, including personally identifiable financial information, confidential.

88.     Defendant violated Section 5 of the FTC Act (and similar state statutes) by disclosing its consumers' nonpublic personal information, including personally identifiable

financial information, without notice and consent. Defendant's conduct was particularly unreasonable given the systematic nature of its collection and distribution of nonpublic personal information, including personally identifiable financial information, and the foreseeable consequences of disclosure of such information.

89.     Barclays's duty to keep nonpublic personal information, including personally identifiable financial information, confidential also arose under the GLBA and related regulations (discussed above), under which Barclays was required to keep its customers' nonpublic personal information, including personally identifiable financial information, confidential absent consent that Barclays did not obtain.

90.     Defendant's violation of Section 5 of the FTC Act (and similar state statutes) and the GLBA (and related regulations) constitutes negligence per se.

91.     Class Members are consumers within the class of persons Section 5 of the FTC Act (and similar state statutes), and the GLBA (and related regulations), were intended to protect.

92.     Moreover, the harm that has occurred is the type of harm the FTC Act (and similar state statutes), and the GLBA (and related regulations), were intended to guard against.

93.     As a direct and proximate result of Barclays's negligence, Plaintiff and Class Members have been injured and are entitled to damages in an amount to be proven at trial.

94.     Plaintiff and Class Members seek to recover the value of the unauthorized access to their PII resulting from Defendants' wrongful conduct. This measure of damages is analogous to the remedies for unauthorized use of intellectual property. Like a technology covered by a trade secret or patent, use or access to a person's personal information is non-rivalrous—the unauthorized use by another does not diminish the rights-holder's ability to practice the patented invention or use the trade-secret protected technology. Nevertheless, a plaintiff may generally

recover the reasonable use value of the IP—i.e., a "reasonable royalty" from an infringer. This is true even though the infringer's use did not interfere with the owner's own use (as in the case of a non-practicing patentee) and even though the owner would not have otherwise licensed such IP to the infringer. A similar royalty or license measure of damages is appropriate here under common Case law damages principles authorizing recovery of rental or use value. This measure is appropriate because (a) Plaintiff and Class Members have a protectable property interest in their PII; (b) the minimum damages measure for the unauthorized use of personal property is its rental value; and (c) rental value is established with reference to market value, i.e., evidence regarding the value of similar transactions.

### COUNT III
### UNJUST ENRICHMENT
**(On Behalf of Plaintiff and the Nationwide Class)**

95.    Plaintiff incorporates and realleges the paragraphs above as if fully set forth herein.

96.    Plaintiff and Class members conferred a benefit on Barclays by having a Facebook account; and having interacted with Barclays's online financial platform.

97.    Barclays acted wrongfully by sharing Plaintiff's and the Class members' PII with Facebook without their consent.

98.    Barclays's practice of sharing Plaintiff's and the Class members' PII with Facebook without their consent, and its failure to disclose this practice, caused it to profit from membership fees it would otherwise not have received.

99.    Barclays' retention of these ill-gotten gains is unjust and inequitable.

100.    Plaintiff, on behalf of himself and the Class members, seeks restitution, restitutionary disgorgement, and all other appropriate relief permitted by the law of unjust enrichment, including reasonable attorney's fees and costs. There is no adequate remedy at law

that would provide redress to Plaintiff and the Class members or ensure that Barclays will not deploy the same data practices in the future.

<u>**COUNT IV**</u>
<u>**DECLARATORY JUDGMENT**</u>
**(On Behalf of Plaintiff and the Nationwide Class)**

101.    Plaintiff repeats and re-alleges the above paragraphs, as if fully alleged herein.

102.    Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, et seq., the Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes described in this complaint.

103.    An actual controversy has arisen regarding Barclays's present and prospective common law and other duties to keep its customers' nonpublic personal information, including personally identifiable financial information, confidential and whether Defendant is currently keeping that information confidential. Plaintiff remains a Barclays consumer who needs to use the Barclays website to manage his accounts and the financial services provided to him by Barclays. Thus, Plaintiff thus remains at imminent risk that additional disclosure of his nonpublic personal information, including personally identifiable financial information, will occur in the future.

104.    Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

> a. Defendant continues to owe a legal duty to secure consumers' nonpublic personal information, including personally identifiable financial information, under the common law, Section 5 of the FTC Act, the GLBA, and various state statutes;
>
> b. Defendant continues to breach this legal duty by disclosing its consumers' nonpublic personal information, including personally identifiable financial information, to unaffiliated third parties.

105.    The Court also should issue corresponding prospective injunctive relief requiring Defendant to keep its nonpublic personal information, including personally identifiable financial information, confidential consistent with law and industry standards.

106.    If an injunction is not issued, Plaintiff and Class Members will suffer irreparable injury, and lack an adequate legal remedy. The risk of additional disclosure is real, immediate, and substantial, as the Facebook Tracking Pixel remains operative on Defendant's website to this day. If additional disclosure occurs, Plaintiff and Class Members will not have an adequate remedy at law because many of the resulting injuries are not readily quantified, and they will be forced to bring multiple lawsuits to rectify the same conduct.

107.    The hardship to Plaintiff and Class Members if an injunction does not issue exceeds the hardship to Defendant if an injunction is issued. Among other things, if Barclays continues to disclose its customers' nonpublic personal information, including personally identifiable financial information, Plaintiff and Class Members will likely be subjected to the harms described herein. On the other hand, the cost to Defendant of complying with an injunction by keeping its customers' nonpublic personal information, including personally identifiable financial information, confidential is relatively minimal (for example, removing the Facebook Tracking Pixel and any similar tracking technologies from its website), and Defendant have a pre-existing legal obligation to do so.

108.    Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing additional unlawful disclosures of nonpublic personal information, including personally identifiable financial information, by Barclays, thus eliminating the additional injuries that would result to Plaintiff and the hundreds of thousands of consumers whose information has been and will continue to be disclosed.

## COUNT V
## BREACH OF CONFIDENCE
### (On Behalf of Plaintiff and the Nationwide Class)

109.    Plaintiff restates and realleges the above paragraphs as if fully set forth herein.

110.    At all times during Plaintiff's and Class Members' interactions with Barclays, Barclays was fully aware of the confidential and sensitive nature of Plaintiff's and Class Members' nonpublic personal information, including personally identifiable financial information.

111.    As alleged herein and above, Barclays's relationship with Plaintiff and Class Members was governed by terms and expectations that Plaintiff's and Class Members' nonpublic personal information, including personally identifiable financial information, would be collected, stored, and protected in confidence, and would not be disclosed to any third parties without notice and consent.

112.    Plaintiff and Class Members provided their nonpublic personal information, including personally identifiable financial information, with the explicit and implicit understanding that Barclays would protect and not permit that information to be disseminated to unaffiliated third parties without notice and consent.

113.    Barclays voluntarily received in confidence Plaintiff's and Class Members' nonpublic personal information, including personally identifiable financial information, with the understanding that and affirmative representation to customers that the information would not be disclosed or disseminated to unaffiliated third parties for marketing purposes.

114.    Barclays disclosed Plaintiff's and Class Members' nonpublic personal information, including personally identifiable financial information, without notice and without their express permission.

115.    But for Barclays's disclosure of Plaintiff's and Class Members' nonpublic personal information, including personally identifiable financial information, in violation of the parties' understanding of confidence, their nonpublic personal information, including personally identifiable financial information, would not have been disclosed third parties without their consent.

116.    The injury and harm Plaintiff and Class Members suffered was the reasonably foreseeable result of Barclays's nonconsensual disclosure of Plaintiff's and Class Members' nonpublic personal information, including personally identifiable financial information. Barclays knew it was disclosing Plaintiff's and Class Members' nonpublic personal information, including personally identifiable financial information, to third parties without their consent—indeed, Barclays's notice to its customers falsely stated that it would not make these disclosures.

117.    As a direct and proximate result of Barclays's breaches of confidence, Plaintiff and Class Members have been injured and are entitled to damages in an amount to be proven at trial.

**COUNT VI**
**BREACH OF CONTRACT**
**(On Behalf of Plaintiff and the Nationwide Class)**

118.    Plaintiff repeats and re-alleges the above paragraphs, as if fully alleged herein.

119.    Barclays's Privacy Notice (the "Notice") is an agreement between Barclays and persons who provided Barclays with their nonpublic personal information, including personally identifiable financial information, including Plaintiff and Class Members.

120.    Barclays's Notice applies to customers, applicants, and former customers of Barclays, and it details how Barclays will both protect and use the nonpublic personal information, including personally identifiable financial information, provided by customers and applicants of Barclays's services. The Notice provides detailed information about what types of customer

information will be shared and with what entities. The Notice promises that "The Barclays Bank Companies do not share [customers' personal information] with nonaffiliates so they can market to you."

121.    Plaintiff and Class Members, on the one hand, and Barclays, on the other, formed a contract when Plaintiff and Class Members provided nonpublic personal information, including personally identifiable financial information, subject to the Notice.

122.    Barclays breached its agreement with Plaintiff and Class Members by disclosing their nonpublic personal information, including personally identifiable financial information, to unaffiliated third parties for marketing purposes. Specifically, Barclays disclosed that information to Meta, in violation of the Notice.

123.    As a direct and proximate result of these breaches of contract, Plaintiff and Class Members sustained actual losses and damages as described in detail above, including but not limited to that they did not get the benefit of the bargain for which they paid and were overcharged by Barclays for its services.

### COUNT VII
### BREACH OF IMPLIED CONTRACT
**(On Behalf of Plaintiff and the Nationwide Class)**

124.    Plaintiff repeats and re-alleges the above paragraphs as if fully alleged herein and asserts this claim in the alternative to their breach of contract claim to the extent necessary.

125.    Plaintiff and Class Members also entered into an implied contract with Barclays when they obtained services from Barclays or otherwise provided nonpublic personal information, including personally identifiable financial information, to Barclays.

126.    As part of these transactions, Barclays agreed to safeguard and protect the nonpublic personal information, including personally identifiable financial information, of Plaintiff and Class Members.

127.    Plaintiff and Class Members entered into implied contracts with the reasonable expectation that Barclays would keep their nonpublic personal information, including personally identifiable financial information, confidential. Plaintiff and Class Members believed that Barclays would use part of the monies paid to Barclays under the implied contracts to keep their nonpublic personal information, including personally identifiable financial information, confidential.

128.    Plaintiff and Class Members would not have provided and entrusted their nonpublic personal information, including personally identifiable financial information, or would have paid less for Barclays's services in the absence of the implied contract or implied terms between them and Barclays. The safeguarding of the nonpublic personal information, including personally identifiable financial information, of Plaintiff and class members was critical to realize the intent of the parties.

129.    Barclays breached its implied contracts with Plaintiff and Class Members to protect their nonpublic personal information, including personally identifiable financial information, when it disclosed that information to Meta.

130.    As a direct and proximate result of Barclays's breach of implied contract, Plaintiff and Class Members sustained actual losses and damages as described in detail above, including that they did not get the benefit of the bargain for which they paid and were overcharged by Barclays for its services.

**COUNT VIII**
**NEW YORK GENERAL BUSINESS LAW**
**N.Y. Gen. Bus. Law §§ 349, et seq.**
**(On Behalf of Plaintiff and the New York Subclass)**

131.    Plaintiff, individually and on behalf of the Class, repeats and alleges the above paragraphs, as if fully alleged herein.

132.    Barclays engaged in deceptive acts or practices in the conduct of its business, trade, and commerce or furnishing of services, in violation of N.Y. Gen. Bus. Law § 349, including:

a. Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff and the Class members' nonpublic personal information, including personally identifiable financial information, including duties imposed by the GLBA and the FTC Act, 15 U.S.C. § 45, which was a direct and proximate cause of the damage to Plaintiff's and class members;

b. Misrepresenting that it would protect the privacy and confidentiality of Plaintiff and the Class members' nonpublic personal information, including personally identifiable financial information, including by keeping that information confidential and not disclosing it to unaffiliated third parties for marketing purposes;

c. Misrepresenting that it would comply with common law and statutory duties pertaining to the security and privacy of Plaintiff and the Class members' nonpublic personal information, including personally identifiable financial information, including duties imposed by the GLBA and FTC Act, 15 U.S.C. § 45;

d. Omitting, suppressing, and concealing the material fact that it did not keep Plaintiff and the Class members' nonpublic personal information, including personally identifiable financial information, confidential; and

e. Omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff and Class members' nonpublic personal information, including personally identifiable financial information, including the duties imposed by the GLBA and the FTC Act, 15 U.S.C. § 45.

133.    Plaintiff and members of the Class were deceived in New York. They also transacted with Barclays in New York by accessing Barclays's website and related financial services (e.g., banking and applying for credit cards) from New York.

134.    Barclays's representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Barclays to protect the confidentiality of consumers' Personal Information.

135.    As a direct and proximate result of Barclays's deceptive and unlawful acts and practices, Plaintiff and Class members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including loss of the benefit of their bargain with Barclays as they would not have paid Barclays for goods and services or would have paid less for such goods and services but for Barclays's violations alleged herein.

136.    Barclays's deceptive and unlawful acts and practices complained of herein affected the public interest and consumers at large, including the tens of thousands of New Yorkers affected by the disclosure of their nonpublic personal information, including personally identifiable financial information.

137.    The above deceptive and unlawful practices and acts by Barclays caused injury to Plaintiff and the Class members that they could not reasonably avoid.

138.    Plaintiff and the Class members seek all monetary and non-monetary relief allowed by law, including actual damages or statutory damages of $50 (whichever is greater), treble damages, restitution, injunctive relief, and attorney's fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the members of the Class, respectfully requests the Court to enter an Order:

A.      certifying the proposed Class under Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3), as set forth above;

B.      declaring that Defendant is financially responsible for notifying the Class Members of the pendency of this suit;

C.      declaring that Defendant has committed the violations of law alleged herein;

D.      providing for any and all injunctive relief the Court deems appropriate;

E.      awarding statutory damages in the maximum amount for which the law provides;

F.      awarding monetary damages, including but not limited to any compensatory, incidental, or consequential damages in an amount that the Court or jury will determine, in accordance with applicable law;

G.      providing for any and all equitable monetary relief the Court deems appropriate;

H.      awarding Plaintiff her reasonable costs and expenses and attorney's fees;

I.      awarding pre- and post-judgment interest to the extent the law allows; and

J.      providing such further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury on all claims so triable.

Date: August 29, 2024                              Respectfully submitted,

**REESE LLP**

By:  _/s/ Michael R. Reese_
      Michael R. Reese
      100 West 93rd Street, 16th Floor
      New York, New York 10025
      Telephone: (212) 643-0500
      _mreese@reesellp.com_

      Kevin Laukaitis (_pro hac vice_ to be filed)
      _klaukaitis@laukaitislaw.com_
      **LAUKAITIS LAW LLC**
      954 Avenida Ponce De Leon
      Suite 205, #10518
      San Juan, PR 00907
      Telephone: (215) 789-4462

      _Counsel for Plaintiff_
      _and the Proposed Class_