**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

ARTHUR VARGAS, *individually and on behalf of all others similarly situated*,

Plaintiff,

v.

BARCLAYS BANK DELAWARE,

Defendant.

Case No. 1:24-cv-6549-LGS

**MEMORANDUM OF LAW IN SUPPORT OF**
**BARCLAYS BANK DELAWARE'S**
**RENEWED MOTION TO COMPEL ARBITRATION**

Amy P. Lally (admitted *pro hac vice*)
SIDLEY AUSTIN LLP
1999 Avenue of the Stars, 17th Floor
Los Angeles, CA 90067
(310) 595-9500

Christina Prusak Chianese
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, NY 10019
(212) 839-5300

Ian M. Ross (admitted *pro hac vice*)
SIDLEY AUSTIN LLP
1001 Brickell Bay Drive
Miami, FL 33131
(305) 391-5100

*Counsel for Defendant Barclays Bank Delaware*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........ 1
BACKGROUND ........ 2
A. Plaintiff Agreed to Arbitration When Opening Three Credit Card Accounts With Barclays........ 2
B. Plaintiff Sued Barclays in Federal Court Under an Undisclosed Alias, and Only Revealed His True Identity When Ordered to Do So by the Court ........ 7
ARGUMENT ........ 9
I. UNDER THE FEDERAL ARBITRATION ACT, ARBITRATION AGREEMENTS MUST BE ENFORCED ACCORDING TO THEIR TERMS ........ 9
II. EACH OF THE ARBITRATION PROVISIONS IN THE CARDMEMBER AGREEMENTS REQUIRES ARBITRATING THIS CASE ........ 10
A. Plaintiff Entered Into Valid Contracts With Arbitration Provisions........ 11
B. This Dispute Falls Within the Scope of the Cardmember Agreements' Arbitration Provisions........ 15
C. Barclays Has Not Waived Its Arbitration Rights........ 19
III. THIS ACTION SHOULD BE STAYED PENDING ARBITRATION........ 19
CONCLUSION........ 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ahmed v. Citibank, N.A.*,
2020 WL 2988666 (E.D.N.Y. June 2, 2020) ....................12

*AT&T Mobility LLC v. Concepcion*,
563 U.S. 333 (2011)....................9

*AT&T Techs., Inc. v. Commc'ns. Workers of Am.*,
475 U.S. 643 (1986)....................10

*Audish v. Am. Express Co.*,
2023 WL 2366888 (S.D.N.Y. Mar. 6, 2023) ....................12

*Barton v. Zhang*,
2024 WL 3228445 (S.D.N.Y. June 27, 2024) ....................16

*Boule v. Credit One Bank*,
2016 WL 3015251 (S.D.N.Y. May 11, 2016) ....................12

*Carr v. Credit One Bank*,
2015 WL 9077314 (S.D.N.Y. Dec. 16, 2015) ....................12

*Cassello v. News Journal Co.*,
2010 WL 5825342 (Del. Super. Ct. Dec. 29, 2010) ....................12

*Christensen v. Barclays Bank Del.*,
2019 WL 1921710 (D. Mass. Apr. 30, 2019) ....................13

*Citizens Bank v. Alafabco, Inc.*,
539 U.S. 52 (2003)....................9

*City of Newark v. Donald M. Durkin Contracting, Inc.*,
305 A.3d 674 (Del. 2023) ....................16

*Cohen v. Chase Bank, N.A.*,
679 F. Supp. 2d 582 (D.N.J. 2010) ....................15

*Collins & Aikman Prods. Co. v. Bldg. Sys., Inc.*,
58 F.3d 16 (2d Cir. 1995)....................16, 17

*Commodities & Minerals Enter. v. CVG Ferrominera Orinoco, C.A.*,
49 F.4th 802 (2d Cir. 2022) ....................11

*Comrey v. Discover Fin. Servs., Inc.*,
806 F. Supp. 2d 778 (M.D. Pa. 2011) .......... 15

*Coregis Ins. Co. v. Am. Health Found.*,
241 F.3d 123 (2d Cir. 2001) .......... 16

*Cote v. Barclays Bank Del.*,
2015 WL 251217 (S.D. Cal. Jan. 20, 2015) .......... 13

*Cusamano v. Sobek*,
604 F. Supp. 2d 416 (N.D.N.Y. 2008) .......... 8

*Dahlink Fin. Corp. v. Bochniak*,
2012 WL 1415815 (Del. Ct. Com. Pl. Mar. 13, 2012) .......... 12

*Daly v. Citigroup Inc.*,
939 F.3d 415 (2d Cir. 2019) .......... 10

*Davis v. Delaware Park*,
2011 WL 2623908 (Del. Super. Ct. June 28, 2011) .......... 12

*Dean Witter Reynolds, Inc. v. Byrd*,
470 U.S. 213 (1985) .......... 9

*Dotson v. Bravo*,
321 F.3d 663 (7th Cir. 2003) .......... 8

*ExxonMobil Oil Corp. v. TIG Ins. Co.*,
44 F.4th 163 (2d Cir. 2022) .......... 10, 11, 15

*Fasano v. Li*,
2023 WL 6292579 (S.D.N.Y. Sept. 27, 2023) .......... 19

*Fasano v. Li*,
47 F.4th 91 (2d Cir. 2022) .......... 16

*FIA Card Servs., N.A. v. Polley*,
68 A.D.3d 1759 (4th Dep't 2009) .......... 12

*Ginoyan v. Barclays Bank Del.*,
443 F. Supp. 3d 1136 (C.D. Cal. 2020) .......... 13

*Goldman, Sachs & Co. v. Golden Empire Schs. Fin. Auth.*,
764 F.3d 210 (2d Cir. 2014) .......... 10

*Grasso v. First USA Bank*,
713 A.2d 304 (Del. Super. Ct. 1998) .......... 12

*Henry Schein, Inc. v. Archer & White Sales, Inc.*,
586 U.S. 63 (2019) ........................................ 10, 18

*Kaiser v. StubHub, Inc.*,
2024 WL 3445059 (S.D.N.Y. July 17, 2024) ........................................ 16

*Krause v. Barclays Bank Del.*,
2013 WL 6145261 (E.D. Cal. Nov. 21, 2013) ........................................ 13

*Leatherbury v. Greenspun*,
939 A.2d 1284 (Del. 2007) ........................................ 14

*Lloyd v. MBNA Am. Bank, N.A.*,
27 F. App'x 82 (3d Cir. 2002) ........................................ 14

*Lubin v. Verint Americas Inc.*,
2021 WL 9080004 (S.D. Fla. June 21, 2021) ........................................ 18

*Mangahas v. Barclays Bank Del.*,
2016 WL 11002179 (C.D. Cal. May 9, 2016) ........................................ 13

*Manigault v. Macy's East, LLC*,
318 F. App'x 6 (2d Cir. 2009) ........................................ 12

*Marsh v. First USA Bank, N.A.*,
103 F. Supp. 2d 909 (N.D. Tex. 2000) ........................................ 15

*Morales v. Trans World Airlines*, *Inc.*,
504 U.S. 374 (1992) ........................................ 16

*Morehouse v. Paypal Inc.*,
2022 WL 912966 (S.D.N.Y. Mar. 28, 2022) ........................................ 12

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
460 U.S. 1 (1983) ........................................ 9

*NRW, Inc. v. Bindra*,
2014 WL 4449779 (S.D.N.Y. Sept. 10, 2014) ........................................ 13

*Oppenheimer & Co. v. Neidhardt*,
56 F.3d 352 (2d Cir. 1995) ........................................ 10

*Ostreicher v. TransUnion, LLC*,
2020 WL 3414633 (S.D.N.Y. June 22, 2020) ........................................ 11

*Poletti v. Pepsi-Cola Bottling Co. of N.Y., Inc.*,
2023 WL 5769498 (S.D.N.Y. Sept. 6, 2023) ........................................ 18

*Prasad v. Barclays Bank Del.*,
2020 WL 6083663 (C.D. Cal. July 29, 2020)....................13

*Robertson v. MBNA Am.*,
2005 WL 8157895 (N.D. Ala. Aug. 16, 2005)....................14

*Rummel Klepper & Kahl, LLP v. Del. River & Bay Auth.*,
2022 WL 29831 (Del. Ch. Jan. 3, 2022)....................16

*Rush v. Oppenheimer & Co.*,
779 F.2d 885 (2d Cir. 1985)....................19

*Saeedy v. Microsoft Corp.*,
2024 WL 4945106 (W.D. Wash. Nov. 21, 2024)....................18

*Salerno v. Credit One Bank, N.A.*,
2015 WL 6554977 (W.D.N.Y. Oct. 29, 2015)....................12

*Smith v. Spizzirri*,
601 U.S. 472 (2024)....................9, 19

*Tsadilas v. Providian Nat'l Bank*,
13 A.D.3d 190 (1st Dep't 2004)....................13

*Weiss v. Am. Express Nat'l Bank*,
2020 WL 6807628 (S.D.N.Y Nov. 18, 2020)....................11, 12

*Worthington v. JetSmarter, Inc.*,
2019 WL 4933635 (S.D.N.Y. Oct. 7, 2019)....................11

*Zocaras v. Castro*,
465 F.3d 479 (11th Cir. 2006)....................8

**Statutes**

9 U.S.C. § 2....................9

9 U.S.C. § 3....................1, 19

9 U.S.C. § 4....................1

5 Del. C. § 952....................13, 14

Defendant Barclays Bank Delaware ("Barclays") respectfully submits this memorandum of law in support of its renewed motion, pursuant to Sections 3 and 4 of the Federal Arbitration Act, *see* 9 U.S.C. §§ 3, 4, to compel arbitration and stay this proceeding pending resolution of the arbitration.

## PRELIMINARY STATEMENT

Plaintiff is a current Barclays credit card customer who brings claims alleging that information related to his "customer interactions" with Barclays were unlawfully disclosed to Meta Platforms, Inc., formerly known as Facebook, Inc. ("Meta" or "Facebook"). Compl. ¶¶ 4, 9. At the outset of this case, Barclays moved to compel this dispute to arbitration because Barclays requires all of its customers to agree to mandatory arbitration of any disputes (other than small claims disputes not relevant here) arising from or relating to the customer's account or relationship with Barclays. Plaintiff did not dispute that his claims fell within the scope of Barclays' current standard arbitration provisions but opposed arbitration because Barclays failed to identify Plaintiff's specific customer agreement. But Barclays had not done so because Plaintiff had filed his suit under an alias, without disclosing that fact to the Court or Barclays, and then refused to provide any information Barclays could use to identify his account. Only after this Court ordered limited discovery on Plaintiff's account information did Plaintiff reveal that he had not filed this case with his real name, which explained why Barclays was unable to locate his customer account.

Now that Plaintiff's identity and credit card account numbers have been revealed, it is clear that Plaintiff has agreed to individually arbitrate this dispute. When Plaintiff opened each of his credit card accounts and began using each credit card, he assented to arbitration clauses (with delegation provisions) in cardmember agreements that cover his claims. Barclays subsequently amended each of the initial arbitration provisions, and the newer clauses also require arbitration of this dispute. So whether under the original customer agreements or the versions of those

agreements as amended, Plaintiff should be compelled to arbitrate his claims.

In a meet-and-confer prior to filing this motion, Plaintiff objected to arbitration solely on the basis that Plaintiff was sent the customer agreements containing the arbitration provisions after he applied for the credit card accounts and his accounts were "opened." But Barclays simply followed the standard procedure followed by essentially every credit card issuer in this country: after Barclays approved Plaintiff's application for a credit card, Barclays assigned Plaintiff an account number and sent him a mailer with his credit card, explaining that he would be bound by the terms of use for the credit card, which were included in the mailer. Those terms included the arbitration provision that Plaintiff has been trying to avoid since this case was filed. Courts routinely enforce credit card agreements with this fact pattern, and this case is no different.

This case should be compelled to arbitration and stayed pending resolution of the arbitration.

## BACKGROUND[1]

### A. Plaintiff Agreed to Arbitration When Opening Three Credit Card Accounts With Barclays

Plaintiff has three credit card accounts with Barclays: a Barclays View-branded credit card account ("Barclays View"), a Upromise-branded credit card account ("Upromise"), and a JetBlue-branded credit card account ("JetBlue"). Third Declaration of Stephenie Beauchamp ("Beauchamp Decl.") ¶ 5.[2] The oldest of the three is the Barclays View account. Plaintiff applied for and was approved for this account on or about November 21, 2006. *See id.* ¶ 7. As discussed in greater

[1] For the purpose of this motion, Barclays accepts Plaintiff's factual allegations as true. Barclays reserves and does not waive its right to advance additional defenses to Plaintiff's claims and allegations should the motion to compel arbitration not be granted, and reserves and does not waive its right to challenge the truth of the facts as alleged by Plaintiff.

[2] The Barclays View account was formerly a iTunes-branded credit card account. *See* Beauchamp Decl. ¶ 5.

detail in the accompanying declaration, once an application for a credit card is approved by Barclays, Barclays mails the card along with the customer agreement containing the contractual terms for the user of the card. This is sent in a single package, making clear to the recipient that the contractual terms relate to the receipt and use of the card, and the back of the credit card provided in the package states that "[i]ts use is subject to the terms of [the] Cardmember Agreement." *Id.* ¶ 8. This is referred to in the credit card industry as a "Card Mailer." *Id*. Barclays followed this procedure for Plaintiff's Barclays View account. *See id.* ¶¶ 9-10. After approving his account, Barclays sent a Card Mailer for this account which included the relevant card and cardmember agreement (the "Barclays View Cardmember Agreement") to the address Plaintiff provided on the application. *See id.*; *see also id.*, Ex. A.

The Agreement provided: "By signing, keeping or using your Card or Account, you agree to the terms and conditions of this Agreement." Beauchamp Decl., Ex. A at 2. The Agreement also contained an arbitration provision that stated in pertinent part:

> Any claim, dispute or controversy ("Claim") by either you or us against the other, or against the employees, agents or assigns of the other, arising from or relating in any way to this Agreement or your Account, or any transaction on your Account including (without limitation) Claims based on contract, tort (including intentional torts), fraud, agency, negligence, statutory or regulatory provisions or any other source of law and Claims regarding the applicability of this arbitration clause or the validity of the entire Agreement, shall be resolved exclusively and finally by binding arbitration under the rules and procedures of the arbitration Administrator selected at the time the Claim is filed.

*Id.* at 1.

The agreement also contained a provision permitting Barclays to amend it at any time. Specifically, it stated that "[w]e can at any time change this Agreement, including the annual percentage rate and any fees, and can add or delete provisions relating to your Account or to the

nature, extent and enforcement of the rights and obligations you or we may have under this Agreement. We will notify you of any change, addition or deletion. . . . As permitted by applicable law, any change, addition or deletion to this Agreement will become effective at the time stated in our notice." *Id.* After being sent the Card Mailer, Plaintiff used his Barclays View card by making charges and payments on his Barclays View account. *See* Beauchamp Decl. ¶ 10.

On January 10, 2013, Barclays mailed Plaintiff a notice that his Barclays View Cardmember Agreement was being amended including as to the "Arbitration Provision." *See* Beauchamp Decl. ¶ 14; *id.*, Ex. B at 1. The amended arbitration provision in the January 10, 2013 notice states in pertinent part:

> At the election of either you or us, any claim, dispute or controversy ("Claim") by either you or us against the other, arising from or relating in any way to this Agreement or your Account, or their establishment, or any transaction or activity on your Account, including (without limitation) Claims based on contract, tort (including intentional torts), fraud, agency, negligence, statutory or regulatory provisions or any other source of law and (except as otherwise specifically provided in this Agreement) Claims regarding the applicability of this arbitration provision or the validity of the entire Agreement, shall be resolved exclusively by arbitration.

*Id.* at 3.

Plaintiff next applied for his Upromise credit card on July 24, 2015, and that application was approved on July 25, 2015. *See id.* ¶¶ 18-20. Consistent with its customary practice, on July 26, 2015, Barclays sent a Card Mailer for this account which included the relevant card and cardmember agreement (the "Upromise Cardmember Agreement") to the address Plaintiff provided on the application. *Id.* ¶¶ 19-20. After, Plaintiff made charges and payments on this account. *Id.*

Plaintiff then applied for his JetBlue credit card on March 24, 2016, and that application was approved on March 25, 2016. *See id.* ¶¶ 26-28. Consistent with its customary practice, on March 26, 2016, Barclays sent a Card Mailer for this account which included the relevant card and cardmember agreement (the "JetBlue Cardmember Agreement") to the address Plaintiff provided on the application. *Id.* ¶¶ 27-28. After, Plaintiff made charges and payments on this account. *Id.*

The Upromise Cardmember Agreement and JetBlue Cardmember Agreement contained substantially similar terms. Both provide that: "By signing, keeping, using or otherwise accepting your Card or Account, you agree to the terms and conditions of this Agreement." *See* Beauchamp Decl., Ex. D at 5; Ex. F at 5. They also both contained arbitration provisions materially identical to the January 2013 amended arbitration provision for the Barclays View account:

> At the election of either you or us, any claim, dispute or controversy ("Claim") by either you or us against the other, arising from or relating in any way to this Agreement or your Account, or their establishment, or any transaction or activity on your Account, including (without limitation) Claims based on contract, tort (including intentional torts), fraud, agency, negligence, statutory or regulatory provisions or any other source of law and (except as otherwise specifically provided in this Agreement) Claims regarding the applicability of this arbitration provision or the validity of the entire Agreement, shall be resolved exclusively by arbitration.

Beauchamp Decl., Ex. D at 6; Ex. F at 6.

Furthermore, each provided that: "We can change this Agreement, including the annual percentage rate and any fees, as permitted by applicable law. . . . We will notify you of any change." Beauchamp Decl., Ex. D at 5; Ex. F at 5.

In 2024, Barclays made materially identical changes to the operative arbitration provisions in the relevant Cardmember Agreements for each of Plaintiff's three credit card accounts. For the Barclays View account, Barclays issued a "Notice About Changes" on August 18, 2024 that was

included in the account statement for the period ending on August 16, 2024. Beauchamp Decl. ¶ 16. For the Upromise account, Barclays issued a "Notice About Changes" on August 20, 2024 that was included in the account statement for the period ending on August 19, 2024. *Id.* ¶ 24. For the JetBlue account, Barclays issued a "Notice About Changes" on September 5, 2024 that was included in the account statement for the period ending on September 4, 2024. *Id.* ¶ 32. On the day that each of these documents were issued, Plaintiff was sent an email to the email address he had provided to Barclays notifying him that the document was available to be viewed on his Barclays online account. *Id.* ¶¶ 16, 24, 32.

These notices updated the arbitration provisions in each of the three Cardmember Agreements to read, in pertinent part, as follows:

> This arbitration provision provides for binding arbitration of all Claims by either you or us against the other if either you or we choose to refer the Claim to arbitration. The terms "you," "we," and "us" are defined below for purposes of this arbitration provision. A "Claim" covered by this provision is any claim, dispute or controversy by either you or us against the other, arising from or relating in any way to this Agreement, your Account, any transaction or activity on your Account, our relationship, products or services provided by us or a third party in connection with this Agreement or your Account, including (without limitation) claims, disputes, or controversies based on contract, tort (including intentional torts), fraud, agency, negligence, statutory or regulatory provisions or any other source of law and (except as otherwise specifically provided in this Agreement). All issues shall be for the arbitrator to decide except issues related to the scope, enforceability, interpretation, or formation of this arbitration agreement, which shall be for the court to decide.

Beauchamp Decl., Ex. C at 9; Ex. E at 9; Ex. G at 9.

After receiving notice of these changes, Plaintiff signed into his Barclays online account. Beauchamp Decl. ¶¶ 16, 24, 32.

### B. Plaintiff Sued Barclays in Federal Court Under an Undisclosed Alias, and Only Revealed His True Identity When Ordered to Do So by the Court

On August 29, 2024, Plaintiff filed this suit against Barclays asserting various claims based on allegations that "Barclays's online banking website—www.banking.barclaysus.com—allows consumers to access their account information" and that "Barclays monitors and records its customers' interaction with its website while they are logged on to access their confidential account information." Compl. ¶ 3. Although it is neither his legal name nor the name he gave to Barclays in opening his three credit card accounts, Plaintiff filed the suit as "Arthur Vargas."

Plaintiff pled in the complaint that he is "a Barclays consumer who needs to use the Barclays website to manage his accounts and the financial services provided to him by Barclays." *Id.* ¶ 103. He alleged that Barclays has a "practice of disclosing" what he deems "its customers' personal financial information" to Meta, via the "Meta Pixel [], a snippet of programming code Barclays chose to install on its website." *Id.* ¶¶ 4, 7. Based on these allegations, Plaintiff asserted various causes of action, *see id.* ¶¶ 74-138.

Shortly after this action was filed, Barclays asked Plaintiffs' counsel for Plaintiff's account information because Barclays was unable to identify a customer with the name "Arthur Vargas" at an address in the Bronx, New York as set forth in the complaint. Declaration of Christina Prusak Chianese ("Chianese Decl.") ¶ 3, ECF No. 21; Second Declaration of Stephenie Beauchamp ¶ 6, ECF No. 30; Second Declaration of Rachel Wise ¶ 4, ECF No. 31. Plaintiff's counsel, however, refused to disclose any information about Plaintiff's account (which Barclays now understands included a refusal to disclose Plaintiff's actual name) without a court-ordered protective order insisting all such information was confidential. Chianese Decl. ¶¶ 2-3. Then, when Barclays offered to enter into a stipulation as requested if Plaintiff would agree that doing so would not waive Barclay's right to compel arbitration, Plaintiff did not agree. *Id.* ¶ 7.

Without the information necessary to identify Plaintiff's specific customer agreement, Barclays moved to compel arbitration on the grounds that Plaintiff had alleged facts that could only be true if he was a Barclays customer, and Barclays requires all of its customers to agree to arbitration in order to receive services from Barclays. *See* ECF No. 18. In support of its motion, Barclays submitted a declaration attaching the operative arbitration provisions in Barclays' credit card customer agreements. *See* Declaration of Stephenie Beauchamp, Ex. A, ECF No. 20-1. In response, Plaintiff did not dispute that his claims fell within the scope of Barclays' current customer arbitration provisions. Instead, he opposed arbitration principally on the ground that Barclays had not identified his specific customer agreement, which was simply a product of his own obstruction in refusing to provide not only his basic account information, but also his actual name. *See* ECF No. 26. The Court then ordered Plaintiff to produce information sufficient for Barclays to identify Plaintiff's account. *See* ECF No. 36.

In response to the Court's order, Plaintiff made a remarkable revelation: his real name is Leopold Bennett and not "Arthur Vargas," which was the name under which he had brought this suit. Plaintiff never sought leave to file this case under a pseudonym nor did give any other indication that he was doing so.[3] This was highly prejudicial to Barclays because it rendered it impossible to identify Plaintiff's agreement to arbitrate, and as a result Barclays incurred legal fees engaging in unnecessary briefing without the benefit of Plaintiff's specific customer agreements.

[3] Filing litigation under a false name is sanctionable conduct, and courts have ordered remedies as severe as dismissal. *See, e.g.*, *Zocaras v. Castro*, 465 F.3d 479 (11th Cir. 2006) (affirming dismissal as a sanction for litigating under a false name); *Dotson v. Bravo*, 321 F.3d 663, 668 (7th Cir. 2003) (same); *Cusamano v. Sobek*, 604 F. Supp. 2d 416, 509-10 (N.D.N.Y. 2008) (recommending sanctions). Here, Barclays reserves all rights to seek its fees and costs associated with the first motion to compel arbitration, which were incurred because Plaintiff not only filed this litigation under a false name, but then refused to admit that he had done so until ordered by this Court to produce limited discovery.

*See* ECF No. 52 at 1-2. Had Plaintiff simply identified his identity from the outset, the present motion could have been brought and resolved months ago. This Court subsequently held that Plaintiff's use of a pseudonym was improper—including because despite claiming that he filed under a pseudonym to protect his identity, he uses his legal name publicly on social media—and ordered him to amend the caption to reflect his real name. *See* ECF No. 65.

Now that Plaintiff's account information and agreements have been identified, Barclays renews its motion to compel arbitration based on Plaintiff's Cardmember Agreements.

## **ARGUMENT**

### I. UNDER THE FEDERAL ARBITRATION ACT, ARBITRATION AGREEMENTS MUST BE ENFORCED ACCORDING TO THEIR TERMS

"Section 2 of the [FAA] makes agreements to arbitrate 'valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.'" *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 336 (2011) (quoting 9 U.S.C. § 2). It applies to any arbitration agreement that is "written" and in a "contract evidencing a transaction involving commerce." 9 U.S.C. § 2; *see also Citizens Bank v. Alafabco, Inc.*, 539 U.S. 52, 56 (2003) ("[T]he term 'involving commerce' in the FAA [is] the functional equivalent of the more familiar term 'affecting commerce'—words of art that ordinarily signal the broadest permissible exercise of Congress' Commerce Clause power."). Once a court determines that the parties to a litigation agreed to arbitrate a dispute, the FAA gives the court no discretion; rather, it must compel the parties to arbitrate and stay the action pending the outcome of the arbitration. *See Smith v. Spizzirri*, 601 U.S. 472, 475-76 (2024); *see also Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985).

There is a policy favoring arbitration and "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr.*

*Corp.*, 460 U.S. 1, 24-25 (1983). Thus, under the FAA, an "order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage." *AT&T Techs., Inc. v. Commc'ns. Workers of Am.*, 475 U.S. 643, 650 (1986) (cleaned up); *see also Daly v. Citigroup Inc.*, 939 F.3d 415, 421 (2d Cir. 2019) (same). "Courts thus apply a presumption of arbitrability if an enforceable arbitration agreement is ambiguous about whether it covers the dispute at hand." *Goldman, Sachs & Co. v. Golden Empire Schs. Fin. Auth.*, 764 F.3d 210, 215 (2d Cir. 2014) (cleaned up). Additionally, where an arbitration agreement "delegates the arbitrability issue to an arbitrator, a court may not decide the arbitrability issue." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 69 (2019). That is, "parties may agree to have an arbitrator decide not only the merits of a particular dispute but also 'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy." *Id.* at 67-68 (cleaned up).

"In deciding a motion to compel arbitration, courts apply a standard similar to that applicable for a motion for summary judgment. Courts must consider all relevant, admissible evidence submitted by the parties and contained in pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, and must draw all reasonable inferences in favor of the non-moving party." *ExxonMobil Oil Corp. v. TIG Ins. Co.*, 44 F.4th 163, 175 (2d Cir. 2022) (cleaned up). At the same time, in order to defeat arbitration, "it is not sufficient for the party opposing arbitration to utter general denials of the facts on which the right to arbitration depends." *Oppenheimer & Co. v. Neidhardt*, 56 F.3d 352, 358 (2d Cir. 1995).

## II. EACH OF THE ARBITRATION PROVISIONS IN THE CARDMEMBER AGREEMENTS REQUIRES ARBITRATING THIS CASE

Under the FAA, "courts consider two factors when deciding if a dispute is arbitrable: (1)

whether the parties agreed to arbitrate, and, if so, (2) whether the scope of that agreement encompasses the claims at issue." *ExxonMobil Oil Corp.*, 44 F.4th at 175 (cleaned up). Both of these requirements are easily met in this case.

### A. Plaintiff Entered Into Valid Contracts With Arbitration Provisions

The Barclays View Cardmember Agreement, Upromise Cardmember Agreement, and JetBlue Cardmember Agreement are each valid contracts that require arbitration of this dispute. In the meet-and-confer proceeding this motion, Plaintiff seemed to assert that the initial Cardmember Agreements were never validly formed. Plaintiff is wrong.

Although each Cardmember Agreement contains a Delaware choice-of-law provision, *see* Beauchamp Decl., Ex. A at 1; Ex. D at 6; Ex. F at 6, New York law governs each contract's formation. *See Commodities & Minerals Enter. v. CVG Ferrominera Orinoco, C.A.*, 49 F.4th 802, 816 (2d Cir. 2022) ("Applying a [choice-of-law provision] to resolve the contract formation issue would presume the applicability of a provision before its adoption by the parties has been established.") (cleaned up); *see also Worthington v. JetSmarter, Inc.*, 2019 WL 4933635, at *4 (S.D.N.Y. Oct. 7, 2019) ("[T]here is a logical flaw inherent in following a contractual choice-of-law provision before determining whether the parties have actually formed the contract in which the choice-of-law clause appears."). "[I]t is clear under New York law that regular use of a credit card constitutes sufficient evidence of the card user's consent to the terms of the agreement governing the account," when "the Cardholder Agreement was mailed to [the customer] with her credit card." *Weiss v. Am. Express Nat'l Bank*, 2020 WL 6807628, at *2 (S.D.N.Y Nov. 18, 2020) (cleaned up); *see also infra* at 12-13 (collecting cases).[4]

[4] The same is true under Delaware law. *See, e.g.*, *Ostreicher v. TransUnion, LLC*, 2020 WL 3414633, at *5 (S.D.N.Y. June 22, 2020) (In case where parties did not dispute that Delaware law applied, explaining that "use of a credit card would constitute acceptance of the terms in an agreement, particularly when it was undisputed that the defendant received a credit card and made

Here, Barclays mailed each of the initial Cardholder Agreements containing arbitration agreements to Plaintiff to the address Plaintiff (repeatedly) provided to Barclays pursuant to Barclays' regular office procedure, and none were returned as undeliverable. *See Manigault v. Macy's East, LLC*, 318 F. App'x 6, 7 (2d Cir. 2009) ("New York law has established a presumption that a party has received documents when mailed to the party's address in accordance with regular office procedures.");[5] Beauchamp Decl. ¶ 8 (describing Barclays' mailing procedures in detail). Each Cardmember Agreement provides that the customer accepts the agreement by using the card. Beauchamp Decl., Ex. A at 2; Ex. D at 5; Ex. F at 5. And Plaintiff used the accounts after this mailing occurred. *See* Beauchamp Decl. ¶¶ 10, 20, 28.

These procedures are typical for the credit card industry and there is a bevy of case law finding enforceable credit card agreements in fact patterns just like this one. *See, e.g.*, *Audish v. Am. Express Co.*, 2023 WL 2366888, at *3-4 (S.D.N.Y. Mar. 6, 2023) (compelling arbitration based on provision in credit card agreement sent with card); *Morehouse v. Paypal Inc.*, 2022 WL 912966, at *5 (S.D.N.Y. Mar. 28, 2022) (same); *Weiss*, 2020 WL 6807628, at *2 (same); *Ahmed v. Citibank, N.A.*, 2020 WL 2988666, at *6-7 (E.D.N.Y. June 2, 2020) (same); *Boule v. Credit One Bank*, 2016 WL 3015251, at *3 (S.D.N.Y. May 11, 2016) (same); *Carr v. Credit One Bank*, 2015 WL 9077314, at *2, *4 (S.D.N.Y. Dec. 16, 2015) (same); *Salerno v. Credit One Bank, N.A.*, 2015 WL 6554977, at *4 , *6 (W.D.N.Y. Oct. 29, 2015) (same); *FIA Card Servs., N.A. v. Polley*, 68 A.D.3d 1759, 1760 (4th Dep't 2009) ("The record establishes that petitioner sent the credit card

---

purchases with it.") (cleaned up) (collecting cases); *Dahlink Fin. Corp. v. Bochniak*, 2012 WL 1415815, at *6 & 6 n.17 (Del. Ct. Com. Pl. Mar. 13, 2012) (same); *Grasso v. First USA Bank*, 713 A.2d 304, 309 (Del. Super. Ct. 1998) (same).

[5] Again, Delaware law is the same. *See, e.g.*, *Davis v. Delaware Park*, 2011 WL 2623908, at *2 (Del. Super. Ct. June 28, 2011) ("Delaware law presumes that a properly addressed mailing has been received by the addressee."); *Cassello v. News Journal Co.*, 2010 WL 5825342, at *3 (Del. Super. Ct. Dec. 29, 2010) (same).

agreement containing the arbitration provision to respondent, and we conclude that the use by respondent of the credit card constituted her consent to comply with the agreement."); *Tsadilas v. Providian Nat'l Bank*, 13 A.D.3d 190, 190 (1st Dep't 2004) (same). Accordingly, the Cardmember Agreements, and the arbitration agreements contained therein, are validly formed contracts.[6]

Furthermore—and although the arbitration provisions in each of the initial terms already required arbitration of this dispute as discussed below—the notices sent in 2013 and 2024 validly amended the arbitration provisions in each Cardmember Agreement. The Delaware statute governing amendment of credit card agreements provides:[7]

> Unless the agreement governing a revolving credit plan otherwise provides, a ***bank may at any time and from time to time amend such agreement in any respect***, whether or not the amendment or the subject of the amendment was originally contemplated or addressed by the parties or is integral to the relationship between the parties. Without limiting the foregoing, such amendment may change terms by the addition of new terms or by the deletion or modification of existing terms, whether relating to plan benefits or features . . . ***arbitration or other alternative dispute resolution mechanisms***, or other matters of any kind whatsoever. . . . Any amendment that does not increase the rate or rates of periodic interest charged by a bank to a borrower under § 943 or § 944 of this title ***may become effective as determined by the bank***. . . . Any notice of an amendment sent by the bank may be included in the same envelope with a periodic statement or ***as part of the periodic statement or in other materials sent to the borrower***.

5 Del. C. § 952(a) (emphasis added).

[6] Indeed, courts routinely enforce Barclays' arbitration provisions with respect to claims brought by customers. *See, e.g.*, *Ginoyan v. Barclays Bank Del.*, 443 F. Supp. 3d 1136, 1142 (C.D. Cal. 2020); *Prasad v. Barclays Bank Del.*, 2020 WL 6083663, at *3 (C.D. Cal. July 29, 2020); *Christensen v. Barclays Bank Del.*, 2019 WL 1921710, at *6 (D. Mass. Apr. 30, 2019); *Mangahas v. Barclays Bank Del.*, 2016 WL 11002179, at *3 (C.D. Cal. May 9, 2016); *Cote v. Barclays Bank Del.*, 2015 WL 251217, at *3 (S.D. Cal. Jan. 20, 2015); *Krause v. Barclays Bank Del.*, 2013 WL 6145261, at *3-4 (E.D. Cal. Nov. 21, 2013).

[7] If valid contracts are established, then the contracts' choice-of-law clauses (which here, each provide for Delaware law) govern. *See e.g.*, *NRW, Inc. v. Bindra*, 2014 WL 4449779, at *7 (S.D.N.Y. Sept. 10, 2014) ("Having determined that the Fourth Amended Complaint alleges a valid contract, … the Court gives force to the choice-of-law provision.").

Under this provision, a bank can therefore unilaterally amend a credit card agreement, including an arbitration provision, by providing notice. *See Lloyd v. MBNA Am. Bank, N.A.*, 27 F. App'x 82, 84 (3d Cir. 2002) ("The credit agreement provided that MBNA could amend the agreement by complying with the notification requirements of Delaware law, which permits the addition of terms providing for arbitration.").

Notably, § 952 permits a bank to amend an arbitration provision without providing a right to opt out of or otherwise reject the changes to an arbitration provision: it explicitly states that "[a]ny amendment that does not increase the rate or rates of periodic interest charged by a bank to a borrower under § 943 or § 944 of this title may become effective as determined by the bank." 5 Del. C. § 952(a). And although the statute lays out extensive requirements for allowing customers to opt out of an amendment, these provisions only apply in the situation carved out of the language quoted in the previous sentence—"[i]f an amendment increases the rate or rates of periodic interest charged by a bank to a borrower under § 943 or § 944 of this title." 5 Del. C. § 952(b)(1). And under the principle of *expressio unius est exclusio alterius*, "[w]here, as here, when provisions are expressly included in one statute but omitted from another, we must conclude that the General Assembly intended to make those omissions." *Leatherbury v. Greenspun*, 939 A.2d 1284, 1291 (Del. 2007); *see Robertson v. MBNA Am.*, 2005 WL 8157895, at *6 (N.D. Ala. Aug. 16, 2005) (provisions in 5 Del. C. § 952(b) "apply only to an amendment that increases the rate or rates of periodic interest charged by a bank to a borrower").

Here, each of the initial Cardmember Agreements reserved the right for Barclays to amend the Agreements at any time. *See* Beauchamp Decl., Ex. A at 1; Ex. D at 5; Ex. F at 5. And Barclays exercised that right by providing Plaintiff with notice of changes to Agreements including "as part of the periodic statement." 5 Del. C. § 952(a). Thus, the amendments are clearly valid under

Delaware law. *See, e.g.*, *Comrey v. Discover Fin. Servs., Inc.*, 806 F. Supp. 2d 778, 784 (M.D. Pa. 2011) (enforcing arbitration agreement amendment because "Delaware law authorizes banks to amend credit card agreements by adding arbitration provisions"); *Cohen v. Chase Bank, N.A.*, 679 F. Supp. 2d 582, 592 (D.N.J. 2010) (enforcing unilateral amendment of arbitration provision under 5 Del. C. § 952(a)); *Marsh v. First USA Bank, N.A.*, 103 F. Supp. 2d 909, 915 (N.D. Tex. 2000) (enforcing unilateral amendment because 5 Del. C. § 952(a) "allowed Defendant to amend the terms of the Cardmember Agreement 'at any time' upon notice").

### B. This Dispute Falls Within the Scope of the Cardmember Agreements' Arbitration Provisions

The second step of the FAA analysis, "whether the scope of that agreement encompasses the claims at issue," is also met here, because each of the three arbitration provisions cover all of Plaintiff's claims. *ExxonMobil Oil Corp.*, 44 F.4th at 175 (cleaned up).

As noted, the arbitration provision in each of the 2024 amendments to the Cardmember Agreements broadly provides:

> This arbitration provision provides for binding arbitration of all Claims by either you or us against the other if either you or we choose to refer the Claim to arbitration. The terms "you," "we," and "us" are defined below for purposes of this arbitration provision. A "Claim" covered by this provision is any claim, dispute or controversy by either you or us against the other, arising from or relating in any way to this Agreement, your Account, any transaction or activity on your Account, our relationship, products or services provided by us or a third party in connection with this Agreement or your Account, including (without limitation) claims, disputes, or controversies based on contract, tort (including intentional torts), fraud, agency, negligence, statutory or regulatory provisions or any other source of law and (except as otherwise specifically provided in this Agreement).

Beauchamp Decl., Ex. C at 9; Ex. E at 9; Ex. G at 9.

Plaintiff's claims plainly fall within the ambit of this arbitration provision. The Second Circuit has explained that in the arbitration context, "[t]he phrases 'arising out of or relating to'

are 'broad language.'" *Fasano v. Li,*, 47 F.4th 91, 102 (2d Cir. 2022) (citation omitted); *see also Collins & Aikman Prods. Co. v. Bldg. Sys., Inc.*, 58 F.3d 16, 20 (2d Cir. 1995) (describing an arbitration provision using the phrase "'any claim or controversy arising out of or relating to'" as "the paradigm of a broad clause.") (cleaned up). Indeed, the "term 'related to' is typically defined [] broadly," encompasses any "connection to" or "reference to," and "is not necessarily tied to the concept of a causal connection." *Coregis Ins. Co. v. Am. Health Found.*, 241 F.3d 123, 128 (2d Cir. 2001) (cleaned up); *see also Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992) (holding that the ordinary meaning of "relating to" is "a broad one"); *see also Kaiser v. StubHub, Inc.*, 2024 WL 3445059, at *4 (S.D.N.Y. July 17, 2024) (describing arbitration clause with "'relating in any way to or arising out of'" provision as "relatively broad" and compelling arbitration); *see also Barton v. Zhang*, 2024 WL 3228445, at *5 (S.D.N.Y. June 27, 2024) (similar).[8]

Here, Plaintiff's claims as alleged arise out of and relate to Plaintiff's use of "the Barclays website to manage his accounts and the financial services provided to him by Barclays." Compl. ¶ 103; *see also id.* ¶ 9 (Barclays "operates a website which allows consumers to access their account information through which it collects and retains the PII of its consumers, and discloses their PII to [a] third party, Facebook."); *see also id.* ¶ 13 (Plaintiff "used Barclays's website to access their financial account information"); *see also id.* ¶ 50 ("Plaintiff has been accessing

[8] Although courts in this Circuit typically apply federal law to questions of scope, Delaware law, which governs the substance of the customer agreements, is similar. *See City of Newark v. Donald M. Durkin Contracting, Inc.*, 305 A.3d 674, 680 (Del. 2023) ("Delaware courts recognize the phrases 'relating to' and 'arising out of' as 'paradigmatically broad terms.'") (citation omitted); *Rummel Klepper & Kahl, LLP v. Del. River & Bay Auth.*, 2022 WL 29831, at *10 (Del. Ch. Jan. 3, 2022) ("Delaware courts have found the use of both 'arising out of' and 'relating to' language in an arbitration provision to be a broad mandate" and that this language "capture[s] the broadest possible universe" of claims) (citations omitted).

Barclays Bank's website regularly on a weekly basis in order to pay his bills."); *see also id.* ¶ 54 ("Plaintiff requests and obtains information regarding finances from Barclays Bank, and Barclays Bank maintains records of Plaintiff's search history and input history to this end."). Specifically, each claim is premised on Plaintiff having provided Barclays with "nonpublic personal information" in connection with Plaintiff "using [Barclays'] financial services" on Barclays' website, which Barclays allegedly thereafter improperly shared. *See id.* ¶¶ 75, 78 (negligence); *see also id.* ¶ 88 (negligence per se); *id.* ¶ 97 (unjust enrichment); *id.* ¶ 103 (declaratory judgment); *id.* ¶¶ 111-13 (breach of confidence); *id.* ¶ 121 (breach of contract); *id.* ¶ 125 (breach of implied contract); *id.* ¶ 133 (New York General Business Law). Because the data that was allegedly improperly shared all relates to information that Plaintiff shared in the context of his "Account" and the "products and services provided by" Barclays to Plaintiff, *see, e.g.*, *id.* ¶ 34 ("The events transmit data showing the exact financial product (e.g. a specific Barclays card, investment product, or savings account) that the consumer obtains."), each claim is squarely covered by the agreement to arbitrate all disputes arising out of or in connection with Plaintiff's "Account," the parties' "relationship," as well as "products or services provided by" Barclays.

Indeed, Plaintiff specifically pleads that a critical issue will be the question of whether Barclays' alleged data disclosures were consented to by Plaintiff, *see* Compl. ¶¶ 66(h), 77, which are not only related to Plaintiff's "Account," the parties' "relationship," as well as "products or services provided by" Barclays but also Plaintiffs' accountholder agreements and the disclosures therein, *see Collins & Aikman Prods. Co.*, 58 F.3d at 22 (claim "relates" to contract if it is "not wholly independent of the contract") (cleaned up). And whether it is proper to disclose any data Barclays may have by virtue of providing services to Plaintiff certainly implicates Barclays' "relationship" with Plaintiff as well as the "products or services provided by" Barclays to Plaintiff.

*See Poletti v. Pepsi-Cola Bottling Co. of N.Y., Inc.*, 2023 WL 5769498, at *5 (S.D.N.Y. Sept. 6, 2023) (describing an arbitration clause covering claims "'arising out of, or, in connection with … the relationship of the parties'" as "quite broad" and compelling arbitration). Accordingly, Plaintiff's alleged claims clearly fall within the scope of his agreements to arbitrate with Barclays. *See, e.g.*, *Saeedy v. Microsoft Corp.*, 2024 WL 4945106, at *17-18 (W.D. Wash. Nov. 21, 2024) (claims based on allegations "Microsoft Edge browser surreptitiously intercepts and collects users' private data" were within scope of arbitration provision covering claims "related to … [plaintiff's] Microsoft account") (cleaned up); *Lubin v. Verint Americas Inc.*, 2021 WL 9080004, at *1, *3 (S.D. Fla. June 21, 2021) (claims that CVS's website "record[ed] [plaintiff's] 'mouse clicks and other interactions' with the website as well as associated metadata" were within scope of arbitration provision that covered "'all disputes arising out of or related to ... any aspect of the relationship between [plaintiff] and CVS or its suppliers or vendors'").

Finally, even if this Court were to disregard the amendments and look to the initial terms of each Cardmember Agreement, arbitration must still be compelled. As an initial matter, each of the initial terms delegated arbitrability disputes about the scope of the arbitration provision to the arbitrator. *See* Beauchamp Decl., Ex. A at 1 ("Claims regarding the applicability of this arbitration clause or the validity of the entire Agreement, shall be resolved exclusively and finally by binding arbitration."); Ex. D at 6 ("Claims regarding the applicability of this arbitration provision or the validity of the entire Agreement, shall be resolved exclusively by arbitration."); Ex. F at 6 (same). So to the extent those claims remain operative, this "court may not decide the arbitrability issue," but must instead refer it to arbitration. *Henry Schein*, 586 U.S. at 69. And even if the scope of the arbitration clause were not delegated, arbitration should still be compelled because, as discussed above, Plaintiff's claims "aris[e] from or relat[e]" to his "Account." *See* Ex. A at 1 (Barclays View

initial arbitration provision covers "[a]ny claim, dispute or controversy ("Claim") … arising from or relating in any way to this Agreement or your Account, or any transaction on your Account"); Ex. D at 6 (Upromise initial arbitration provision covers "any claim, dispute or controversy ("Claim") by either you or us against the other, arising from or relating in any way to this Agreement or your Account, or their establishment, or any transaction or activity on your Account"); Ex. F at 6 (JetBlue initial arbitration provision covers "any claim, dispute or controversy ("Claim") by either you or us against the other, arising from or relating in any way to this Agreement or your Account, or their establishment, or any transaction or activity on your Account").

### C. Barclays Has Not Waived Its Arbitration Rights

There is no basis to find waiver of Barclays' arbitration rights in this case. Barclays has not filed a responsive pleading or taken any affirmative action to litigate the case in this Court prior to moving to compel arbitration and, in fact, immediately placed Plaintiff's counsel on notice of its intent to compel arbitration. *See, e.g.*, *Fasano v. Li*, 2023 WL 6292579, at *11 (S.D.N.Y. Sept. 27, 2023) (citing *Rush v. Oppenheimer & Co.*, 779 F.2d 885, 888 (2d Cir. 1985)) (even moving to dismiss does not waive arbitration). Barclays hereby reserves its right and provides Plaintiff fair notice of its intention to enforce its applicable contractual right to compel arbitration against unnamed, putative class members.

## III. THIS ACTION SHOULD BE STAYED PENDING ARBITRATION

Under the Federal Arbitration Act, which is incorporated by the parties' agreements, this action should be stayed while Plaintiff's individual claims are arbitrated. *See* 9 U.S.C. § 3 (requiring court to issue a stay upon compelling arbitration); *see also Smith*, 601 U.S. at 475-76 (stay mandatory when claims are arbitrable).

## CONCLUSION

For the foregoing reasons, Barclays respectfully requests that the Court issue an order compelling arbitration and staying this proceeding pending resolution of the arbitration.

Dated: February 25, 2025

By: /s/ *Christina Prusak Chianese*
Christina Prusak Chianese
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, NY 10019
Telephone: (212) 839-5300
Facsimile: (212) 839-5599
Email: cchianese@sidley.com

Amy P. Lally (admitted *pro hac vice*)
SIDLEY AUSTIN LLP
1999 Avenue of the Stars, 17th Floor
Los Angeles, CA 90067
Telephone: (310) 595-9500
Facsimile: (310) 595-9501
Email: alally@sidley.com

Ian M. Ross (admitted *pro hac vice*)
SIDLEY AUSTIN LLP
1001 Brickell Bay Drive
Miami, FL 33131
Telephone: (305) 391-5100
Facsimile: (305) 391-5101
Email: iross@sidley.com

*Counsel for Defendant Barclays Bank Delaware*

**WORD COUNT VERIFICATION**

I, Christina Prusak Chianese, certify that according to the word count of the word-processing program used to prepare the foregoing memorandum of law, and exclusive of the portions of it that are excluded by Local Rule 7.1, there are 6,663 words in the document.