**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| LEOPOLD BENNET, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>BARCLAYS BANK DELAWARE,<br><br>Defendant. | Case No. 1:24-cv-6549-LGS |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO COMPEL ARBITRATION**

# TABLE OF CONTENTS

I. INTRODUCTION ........................................ 1
II. STATEMENT OF THE FACTS ........................................ 2
III. ARGUMENT ........................................ 3
A. Defendant Relies on Inadmissible Evidence to Support its Motion ........................................ 3
B. Barclays Failes to Prove Plaintiff is Bound by the Agreements ........................................ 10
1. Barclays Fails to Identify which, if any, Arbitration Agreement Plaintiff Consented To. 11
2. Under *Lipsett v. Popular Bank*, "continued account use" alone does not constitute a binding agreement. ........................................ 12
C. The GBL § 349 Claim is Unenforceable under the Effective Vindication Doctrine and the Poison Pill Provision. ........................................ 15
1. The Court has Jurisdiction to Rule on the Effective Vindication Doctrine. ........................................ 15
2. Effective Vindication Doctrine Renders the Clause Unenforceable ........................................ 16
a. Application of the Effective Vindication Doctrine to the Present Dispute ........................................ 16
b. The Effective Vindication Doctrine Applies to State Statutory Rights ........................................ 22
3. The Poison Pill Provision Ends the Motion to Compel Arbitration ........................................ 24
IV. CONCLUSION ........................................ 25

## TABLE OF AUTHORITIES

Page(s)

**CASES**

*Am. Express Co. v. Italian Colors Rest.*,
570 U.S. 228 (2013)........................................16, 17, 21

*Applied Energetics, Inc. v. NewOak Capital Markets, LLC,*
645 F.3d 522 (2d Cir. 2011)........................................10

*Bandler v. BPCM NYC, Ltd.*,
2014 WL 5038407 (S.D.N.Y. Sept. 29, 2014)........................................3

*Bensadoun v. Jobe-Riat*,
316 F.3d 171 (2d Cir. 2003)........................................3

*Bucklew v. Precythe*,
587 U.S. 119 (2019)........................................23

*Cedeno v. Sasson*,
100 F.4th 386 (2d Cir. 2024)........................................passim

*Chen v. Premier Fin. Alliance, Inc.*,
2019 WL 280944 (N.D. Cal. Jan. 22, 2019)........................................8

*Cifra v. Gen. Elec. Co.*,
252 F.3d 205 (2d Cir. 2001)........................................4

*CIT Group/Business Credit, Inc. v. Phoenix Fuel, LLC*,
2010 WL 11597290 (C.D. Cal. May 7, 2010)........................................8, 9

*Coinbase, Inc. v. Suski,*
144 S. Ct. 1186 (2024)........................................1, 11

*Doctors Assocs., Inc. v. Alemayehu,*
934 F.3d 245 (2d Cir. 2019)........................................10

*Duran v. EmployBridge Holding Co.*,
(2023) 92 Cal. App.5th 59........................................25

Epic Systems Corp. v. Lewis,
138 S. Ct. 1612 (2018)........................................21

*Fahy v. Minto Devel. Corp.*,
722 F.Supp.3d 784 (N.D. Ill. 2024)........................................22, 23

*Ferguson v. Corinthian Colls., Inc.*,
733 F.3d 928 (9th Cir. 2013) ........ 23

*Fitzgerald v. Wildcat*,
687 F.Supp. 3d 756, (W.D. Va. 2023) ........ 22

*Gaft v. Mitsubishi Motor Credit of America*,
2009 WL 3148764 (E.D.N.Y. Sept. 29, 2009) ........ 8

*Gringras v. Think Finance, Inc*,
922 F.3d 112 (2d Cir. 2019) ........ 18, 24

*Harris v. W6LS, Inc.*,
2024 WL 2319716 (N.D. Ill. May 22, 2024) ........ 23, 24

*Hayes v. Delbert Serv. Corp.*,
811 F.3d 666 (4th Cir. 2016) ........ 18

*Hines v. Overstock.com, Inc.*,
380 F. App'x 22 (2d Cir. 2010) ........ 3

*Jack v. Ring LLC*,
91 Cal.App.5th 1186 (2023) ........ 24

*Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher*,
52 N.Y.2d 105 (1981) ........ 13

*Lipsett v. Popular Bank*,
2024 WL 111247 (2d Cir. Jan. 10, 2024) ........ passim

*Markets Grp. v. Oliveria*,
2020 WL 820654 (S.D.N.Y. Feb. 3, 2020) ........ 7

*Mastrobuono v. Sherson Lehman Hutton, Inc.*,
514 U.S. 52 (1995) ........ 25

*McArdle v. AT&T Mobility LLC*,
2017 WL 4354998 (N.D. Cal. Oct. 2, 2017) ........ 24

*Meyer v. Uber Techs., Inc.*,
868 F.3d 66 (2d Cir. 2017) ........ 3

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,
473 U.S. 614 (1985) ........ 17, 19

*Morgan v. Sundance, Inc.*,
142 S. Ct. 1708 (2022) ........ 10, 25

*New York ex rel. Spitzer v. Saint Francis Hospital*,
94 F. Supp. 2d 423 (S.D.N.Y. 2000) ............ 7

*Nicosia v. Amazon.com, Inc.*,
384 F.Supp.3d 254 (E.D.N.Y. 2019) ............ 7

*Nicosia v. Amazon.com, Inc.*,
834 F.3d 220 (2d Cir. 2016) ............ 3

*PaineWebber Inc. v. Bybyk*,
81 F.3d 1193 (2d Cir. 1996) ............ 25

*Preston v. Ferrer*,
552 U.S. 346 (2008) ............ 22

*Rightnour v. Tiffany & Co.*,
239 F. Supp. 3d 744 (S.D.N.Y. 2017) ............ 10

*Schnabel v. Trilegiant Corp.*,
697 F.3d 110 (2d Cir. 2012) ............ 10

*Smith v. Board of Directors of Triad Manufacturing*,
13 F.4th 613 (7th Cir. 2021) ............ 19

*Telenor Mobile Comms. AS v. Storm LLC*,
584 F.3d 396 (2d Cir. 2009) ............ 15

*Torres v. CleanNet, U.S.A., Inc.*,
90 F. Supp. 3d 369 (E.D. Pa. 2015) ............ 23

*Trustees of the Pavers and Road Builders District Council Welfare v. M.C. Landscape Group, Inc.*, 2015 WL 12645526 (E.D.N.Y. Oct. 16, 2015) ............ 8

*Viking River Cruises, Inc. v. Moriana*,
596 U.S. 639 (2022) ............ 17, 22, 23, 24

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011) ............ 21

**STATUTES**

9 U.S.C. §§ 2–4 ............ 16
15 U.S. C. §§ 6801 ............ 1
29 U.S.C. § 1109(a) ............ 19
New York General Business Law § 349 ............ passim

**RULES**

Federal Rule of Evidence 1002 ............ 7

Plaintiff Leopold Bennett a/k/a Arthur Vargas ("Plaintiff") respectfully submits the following opposition to Defendant Barclays Bank Delaware's ("Defendant" or "Barclays") Motion to Compel Arbitration (ECF No. 67)("Motion") and states as follows:

## I. <u>INTRODUCTION</u>

This action arises from Barclays's practice of unlawfully providing customer information to third-party Meta Platforms, Inc. without the customer's knowledge or permission. This occurs through the use of Meta Pixel, a snippet of programming code Barclays installed on its website that automatically sends information about its users to Meta. Barclays does this in direct violation of the Gramm-Leach-Bliley Act ("GBLA"), 15 U.S. C. §§ 6801, which bars financial institutions, such as Barclays, from disclosing a consumer's "personal identifiable financial information" without advance notification and opt-out rights. Accordingly, Plaintiff filed this class action lawsuit seeking to hold Barclays accountable for its unlawful conduct.

Instead of confronting the allegations directly, Barclays seeks to hide behind an "alleged" arbitration agreement, but "Arbitration" is not some mystical force by which Barclays can create an agreement through the simple utterance of the word. Rather, as the Supreme Court of the United States has made clear time and again, "[a]rbitration is a matter of contract and consent, and ***we have long held that disputes are subject to arbitration if, and only if, the parties actually agreed to arbitrate those disputes.***" *Coinbase, Inc. v. Suski,* 144 S. Ct. 1186, 1191 (2024)(emphasis added). Indeed, in affirming the denial of a motion to compel arbitration by one of Barclay's banking competitors, the Second Circuit recently held that "[i]t is a basic tenet of contract law that, in order [for an arbitration provision] to be binding, a contract requires a meeting of the minds and a manifestation of mutual assent." *See Lipsett v. Popular Bank*, 2024 WL 111247, at *1 (2d Cir. Jan. 10, 2024) (affirming denial of a motion to compel arbitration and requiring claims to be heard in a court of law).

Barclays fails to bear its threshold burden of proving that a binding contract containing an arbitration agreement was formed between Plaintiff and Barclays. Specifically, it fails to present ***admissible*** evidence that Plaintiff ever received the agreements. But even if, *arguendo*, the Court presumes he did, Barclays fails to meet the basic standard to show Plaintiff was on sufficient notice that his use of the card constituted acceptance. Finally, even if*, arguendo*, the Court looks past the insurmountable obstacles to formation, the agreement's language is unenforceable under the effective vindication doctrine. As such, this Court should deny Defendant's Motion to Compel.

## II. STATEMENT OF THE FACTS

Plaintiff commenced this action against Barclays on August 29, 2024, alleging that Barclays unlawfully discloses its customers' personal financial information to third-party Meta Platforms, Inc. through the Meta Pixel, a snippet of programming code Barclays installed on its website that sends information about its users to Meta. Compl. ¶¶ 3-4, 7. Plaintiff holds three credit card accounts with Barclays: a Barclays View-branded credit card account (formerly an iTunes-branded credit card account), a Upromise-branded credit card account, and a JetBlue-branded credit card account. Beauchamp Decl. ¶ 5. The oldest of these accounts, the Barclays View account, was applied for and approved on or about November 21, 2006. *Id.* ¶ 7. Notably, none of the applications for these three credit cards contained an arbitration provision.

Rather, Barclays claims that only after completion of the application and approval that it later mailed a "Card Mailer" containing the credit card and the corresponding cardmember agreement to the address Plaintiff provided on his application. *Id.* ¶¶ 8-10; Ex. A. This cardmember agreement stated, "By signing, keeping or using your Card or Account, you agree to the terms and conditions of this Agreement." Beauchamp Decl., Ex. A at 2. Thereafter, the arbitration provision was included. The agreement allowed Barclays to unilaterally amend its terms at any time, including arbitration provisions, without requiring Plaintiff's affirmative consent. Beauchamp

Decl., Ex. A. On January 10, 2013, Barclays allegedly mailed an amendment revising the arbitration provision. Beauchamp Decl. ¶ 14. Barclays contends that Plaintiff's mere continued use of the card signified acceptance. However, Plaintiff was not given a meaningful opportunity to opt out without closing his account.

Plaintiff later applied for and was approved for his Upromise credit card in 2015 and his JetBlue credit card in 2016. Beauchamp Decl. ¶¶ 18-20, 26-28. Again, neither application contained the arbitration provision. Both agreements contained materially identical arbitration provisions without evidence of explicit assent. In 2024, Barclays again unilaterally amended the arbitration provisions. It issued "Notice About Changes" updates in account statements for all three accounts between August and September 2024. Beauchamp Decl. ¶¶ 16, 24, 32. Barclays sent an email notification directing Plaintiff to review these changes online but provided no mechanism to meaningful consent beyond continued account use.

## III. <u>ARGUMENT</u>

### A. Defendant Relies on Inadmissible Evidence to Support its Motion

As the party seeking to compel arbitration, Barclays "bears an initial burden of demonstrating that an agreement to arbitrate was made." *Hines v. Overstock.com, Inc.*, 380 F. App'x 22, 24 (2d Cir. 2010). In deciding motions to compel, courts apply a standard similar to that applicable to a motion for summary judgment. *Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003); *see also Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 74 (2d Cir. 2017). "The summary judgment standard requires a court to consider all relevant, ***admissible*** evidence submitted by the parties and contained in pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016) (internal quotation, citations and edits omitted) (emphasis added). Moreover, the court "credit[s] all factual inferences that could rationally be drawn, in favor of the party opposing." *Bandler v. BPCM NYC, Ltd.*, 2014

WL 5038407, at *6 (S.D.N.Y. Sept. 29, 2014), *aff'd sub nom. Michael Bandler, MB & Co. v. BPCM NYC, Ltd.,* 631 F. App'x 71 (2d Cir. 2016) (citing *Cifra v. Gen. Elec. Co*., 252 F.3d 205, 216 (2d Cir. 2001)).

Barclays relies solely on the declaration of Stephenie Beauchamp to support its Motion. *See* ECF No. 69 ("Beauchamp Declaration"). Throughout her declaration, Ms. Beauchamp cites to Barclays' business records and what they purportedly say. Specifically:

- Paragraph 7 purports that "According to the notes maintained in relation to Plaintiff's Barclays View account, on or about November 21, 2006, Plaintiff applied for the Barclays View account by completing and submitting an application. In doing so, Plaintiff provided [redacted] as his mailing address ("Home Address") for the account. On or about the same day, November 21, 2006, Barclays approved Plaintiff's application." But the records detailing this were never produced.

- Paragraph 9 purports that "on or about November 21, 2006, Barclays sent Plaintiff his Card Mailer via First Class Mail for the Barclays View account, which included the credit card for the account, Cardmember Agreement, and card activation instructions." While Barclays provides what it purports to be the Barclays View Cardmember Agreement, it does not provide any documents showing the notes indicating that it was sent or sent on that date.

- Paragraph 10 purports that "The Card Mailer for the Barclays View account was mailed via USPS First Class Mail to the Home Address provided by Plaintiff on the application" and that "Thereafter, Plaintiff began using his Barclays View account. Plaintiff made charges on the account and made payments to the account beginning in or around December 12, 2006." Such information could only be gathered from Barclay's records but it did not produce these records.

- Paragraph 14 purports, "According to the notes maintained in relation to Plaintiff's Barclays View account, on or about January 10, 2013, Barclays mailed a document addressed to Plaintiff via USPS First Class Mail to the Home Address containing a notice of an 'Amendment to [Plaintiff's Barclays View] Cardmember Agreement.'" While it provides a purported copy of the Amendment to the Cardmember Agreement, it does not provide the records that it relies on to show this document was actually mailed out.

- Paragraph 16 purports, "According to the notes maintained in relation to Plaintiff's Barclays View account, on August 18, 2024, Barclays issued a 'Notice About Changes' to his Barclays View Cardmember Agreement's arbitration provision." Again, it provides the purported notice but not the records reflecting this actually went out.

- Paragraph 16 also purports that "Plaintiff has opted into receiving paperless statements, on the date that the monthly statement and notice of change were issued, Plaintiff was sent an email notification at the email address he provided to Barclays [redacted] that this

document was available to be viewed on his Barclays online account." But Barclays fails to provide any record reflecting how and when Plaintiff "opted into receiving paperless statements." That "opt-out" may not be enforceable, and it is not for Ms. Beauchamp—Vice President of Bank Operations—to make that determination. That is for the Court based on arguments by counsel. Yet she simply states it as if it is axiomatic. But because Barclays failed to produce these records, and whatever documents allegedly notified Plaintiff of this opt-out and reflected his alleged acceptance of that opt-out, Plaintiff has not been given the opportunity to challenge that alleged opt-out.

- Paragraph 16 also claims "According to the notes maintained by Barclays, Plaintiff signed into his Barclays outline account on August 30, 2024, 12 days after receiving this notice." But again, those notes were never produced.

- Paragraph 18 purports, "According to the notes maintained in relation to Plaintiff's Upromise account, on or about July 24, 2015, Plaintiff applied for his Upromise account by completing and submitting an application. In doing so, Plaintiff provided the Home Address for the account. On or about July 25, 2015, Barclays approved Plaintiff's application." These notes were never produced.

- Paragraph 19 purports, "on or about July 26, 2015, Barclays mailed Plaintiff his Card Mailer for the Upromise account, which included the credit card for the account, Cardmember Agreement, and card activation instructions." Again, while Barclays provides a purported copy of the Cardmember Agreement, it does not provide the records that it relies on to show this document was actually mailed out.

- Paragraph 20 purports that "[t]he Card Mailer for the Upromise account was mailed via USPS First Class Mail to the Home Address provided by Plaintiff on the application[,]" and that "Plaintiff made charges on the account and made payments to the account beginning in or around August 11, 2015." Again, the records to prove these contentions were never produced.

- Paragraph 24 purports, "According to the notes maintained in relation to Plaintiff's Upromise account, on August 20, 2024, Barclays issued a 'Notice About Changes' to his Upromise Cardmember Agreement's arbitration provision." While a copy of the purported notice was produced, the records reflecting its issuance were not.

- Paragraph 24, like paragraph 16, purports that "Because Plaintiff has opted into receiving paperless statements, on the date that the monthly statement and notice of change were issued, Plaintiff was sent an email notification at the email address he provided to Barclays [redacted] that this document was available to be viewed on his Barclays online account." Again, the records reflecting how and when the opt-out notice was sent and how he purportedly accepted it were not produced. As such, Plaintiff is prejudiced in his ability to challenge their enforceability.

- Paragraph 24 further purports "According to the notes maintained by Barclays, Plaintiff signed into his Barclays outline account on August 30, 2024, 10 days after receiving this notice." Again, these records were not produced.

- Paragraph 26 purports "According to the notes maintained in relation to Plaintiff's JetBlue account, on or about March 23, 2016, Plaintiff applied for his JetBlue account by completing and submitting an application. In doing so, Plaintiff provided the Home Address as his mailing address for this account. On or about March 25, 2016, Barclays approved Plaintiff's application." Again, the records reflecting these statements were never produced.

- Paragraph 27 purports "on or about March 25, 2016, Barclays mailed Plaintiff his Card Mailer for the JetBlue account, which included the credit card for the account, Cardmember Agreement, and card activation instructions." The records reflecting this were never produced.

- Paragraph 28 purports, "The Card Mailer for the JetBlue account was mailed via USPS First Class Mail to the Home Address provided by Plaintiff on the application[,]" and that "Plaintiff made charges on the account and made payments to the account beginning in or around March 1, 2017." The records reflecting this were never produced.

- Paragraph 32 purports, "According to the notes maintained in relation to Plaintiff's JetBlue account, on September 5, 2024, Barclays issued a "Notice About Changes" to his JetBlue Cardmember Agreement's arbitration provision," and that "[t]he notice was included with the monthly statement for Plaintiff's JetBlue account for the period ending on September 4, 2024." While a copy of the purported notice was produced, the records reflecting its issuance were not.

- Paragraph 32, like paragraphs 16 and 24, purports that "Because Plaintiff has opted into receiving paperless statements, on the date that the monthly statement and notice of change were issued, Plaintiff was sent an email notification at the email address he provided to Barclays [redacted] that this document was available to be viewed on his Barclays online account." Again, the records reflecting how and when the opt-out notice was sent and how he purportedly accepted it were not produced. As such, Plaintiff is prejudiced in his ability to challenge their enforceability.

- Paragraph 32 further purports "According to the notes maintained by Barclays, Plaintiff signed into his Barclays outline account on September 10, 2024, 5 days after receiving this notice." Again, these records were not produced.

These statements about "what the records said" are inadmissible under the best evidence rule. Barclays never produced the business records reflecting these statements made by Ms. Beauchamp, despite Barclays making a huge deal about their need and ability to gather the requisite information to file the Motion. *See e.g.* Defendant's Memorandum of Law in Support of Motion (ECF No. 68)("Mem.") at 7-9. In fact, on January 21, Plaintiff's counsel specifically requested that Barclays "[p]lease produce to us any information you have collected regarding our

client." *See* Declaration of Charles D. Moore Ex. 1. The above-mentioned records were ***never produced***.

Federal Rule of Evidence 1002 states, "[a]n original writing, recording, or photograph ***is required*** in order to prove its content unless these rules or a federal statute provides otherwise." (emphasis added). This is known as the "best evidence rule," which precludes a party from submitting a declaration describing a record instead of producing the actual record. *Nicosia v. Amazon.com, Inc.*, 384 F.Supp.3d 254, 268 (E.D.N.Y. 2019).

On all fours, in *Nicosia*, Amazon moved to compel arbitration. To prove the notice and acceptance element of formation, Amazon submitted a declaration purported to describe the sign-up process. *Nicosia*, 384 F.Supp.3d at 268 n.6. But the district court rightfully rejected this declaration under the best evidence rule, noting "Amazon has not provided even the faintest excuse for its failure to produce the 2012 Prime sign-up flow." *Id.* at 268. The same is true here, where having made a huge deal about its ability to obtain the relevant records, Barclays failed to produce them.

Equally illustrative, in *Markets Group v. Oliveria*, the plaintiff attempted to prove the contents of this customer list through a declaration. *See Markets Grp. v. Oliveria*, 2020 WL 820654, at *8 (S.D.N.Y. Feb. 3, 2020). But, the court rightfully refused to consider the statements in the declaration based on the best evidence rule. *Id.* It stated, "the customer lists already produced by Markets – which, based on the record before this Court, do *not* contain nonpublic, customer-specific data – remain the best evidence of their respective contents, and Raleigh's unsupported contentions that Markets' customer lists contained more detailed information will be disregarded." *See Id.* (citing *New York ex rel. Spitzer v. Saint Francis Hospital*, 94 F. Supp. 2d 423, 428 (S.D.N.Y. 2000) (striking portions of an affidavit proffered in support of a motion for summary judgment

that commented on the contents of letter correspondence because "the letters themselves [were] the best evidence of their contents"); *Trustees of the Pavers and Road Builders District Council Welfare v. M.C. Landscape Group, Inc.*, No. 12 CV 0834, 2015 WL 12645526, *21 (E.D.N.Y. Oct. 16, 2015) (disregarding declaration submitted in support of summary judgment motion stating that non-produced "books and records" created a genuine issue of material fact about the accuracy of other probative documents as the documents themselves were the best evidence of their contents); *Gaft v. Mitsubishi Motor Credit of America*, No. 07 Civ. 527, 2009 WL 3148764, *4 (E.D.N.Y. Sept. 29, 2009) (disregarding portions of affidavit submitted in support of summary judgment motion describing the contents of a report as such statements were barred by the best evidence rule)).

As yet another example, in *Chen v. Premier Financial Alliance, Inc.*—cited favorably by *Nicosia*—the defendant moved to compel arbitration based, in part, on the declaration of their counsel. *See Chen v. Premier Fin. Alliance, Inc.*, No. 18-3771, 2019 WL 280944, at *1 (N.D. Cal. Jan. 22, 2019). However, the court rejected the declaration:

> Plaintiffs object to the declaration of Steven Early (Dkt. No. 40) as hearsay and contrary to the best evidence rule. Plaintiffs contend that defendants' failure to offer better evidence within their control should result in an adverse inference. The Court finds the objections well taken.

*Id.* at n.2.

The court in *CIT Group/Business Credit, Inc. v. Phoenix Fuel, LLC*, No. CV 09-3387-GHK (RZx), 2010 WL 11597290 (C.D. Cal. May 7, 2010), reached a similar conclusion, explaining:

> [I]n the absence of independent personal knowledge of the events and facts described, we are forced to conclude that [the declarants] have merely reviewed business or computer records and reported what they contain. In such a case, the best evidence rule requires the production of the underlying business or computer records, i.e., authenticated copies or printout of the relevant records. . . . Plaintiff has not proffered sufficient evidence to demonstrate that [the declarants] had independent personal knowledge of the purported payment to JP Morgan.

> Therefore, the best evidence rule requires that the original business or computer records be produced as evidence.

*Id.* at *7.

Ms. Beauchamp does not claim to have independent knowledge of the events discussed in her declaration. In fact, some of these took place before she became an employee of Barclays. *Compare* Beauchamp Decl. ¶ 3 (stating she became an employee in 2007) *with* ¶ 7 (describing events in 2006). To the contrary, she makes it quite clear that her testimony is based on the business records. *See e.g.* ¶ 6 ("I have reviewed Barclays' business records relating to Plaintiff's three credit card accounts").

Ms. Beauchamp's representations cannot simply be taken at face value. For example, Ms. Beauchamp claims Plaintiff applied for the JetBlue card on March 23, 2016, but Defendant's website from March 30, 2016, does not show that the JetBlue card was being offered. This raises significant concerns as to the accuracy of these representations. Moore Decl. Ex. 2.

Under the best evidence rule, Barclays cannot introduce what the business records reflect through the testimony of Ms. Beauchamp. It must produce the actual records. Having failed to do so—despite being given every opportunity—the Beauchamp declaration is inadmissible and cannot be considered on this Motion.

But once the Beauchamp declaration is properly excluded, Barclays has no admissible evidence to prove Plaintiff received notice of or assented to the terms Barclays has put forward. Moreover, as described in detail below, notice and assent are critical to the determination that an enforceable arbitration agreement exists. With no admissible evidence of Plaintiff's agreement to its Terms, Barclays cannot carry its burden to prove Plaintiff is bound by the arbitration agreement. For this reason alone, Barclays' Motion should be denied.

**B. Barclays Failes to Prove Plaintiff is Bound by the Agreements**

As a preliminary matter, the threshold question of whether an agreement to arbitrate has been formed must be decided by the Court and cannot be delegated to an arbitrator. *Doctors Assocs., Inc. v. Alemayehu,* 934 F.3d 245, 251-52 (2d Cir. 2019); *see also Schnabel v. Trilegiant Corp.,* 697 F.3d 110, 118 (2d Cir. 2012) ("Inasmuch as the arbitrator has no authority of any kind with respect to a matter at issue absent an agreement to arbitrate, the question of whether such an agreement exists and is effective is necessarily for the court and not the arbitrator.").

Furthermore, the Federal Arbitration Act ("FAA") prohibits courts from adopting any "special, arbitration-preferring procedural rules" that "tilt the playing field in favor of (or against) arbitration." *Morgan v. Sundance, Inc.,* 142 S. Ct. 1708, 1713–14 (2022). This new precedent is significant to this case because it supersedes prior case law that may have suggested a policy in favor of arbitration or that the FAA requires courts to construe contracts in favor of arbitration. *Id.* at 1713 (clarifying that the pro-arbitration "federal policy is about treating arbitration contracts like all others, not about fostering arbitration"). Every court, including this Court, must consider the arbitration clause just as it would any other contract term. *Id.* ("Accordingly, a court must hold a party to its arbitration contract just as the court would to any other kind. But a court may not devise novel rules to favor arbitration over litigation."). This reasoning aligns with decisions in this Circuit, which hold that the general presumption in favor of arbitration "does not apply to disputes concerning whether an agreement to arbitrate has been made." *Rightnour v. Tiffany & Co.,* 239 F. Supp. 3d 744, 750 (S.D.N.Y. 2017) (quoting *Applied Energetics, Inc. v. NewOak Capital Markets, LLC,* 645 F.3d 522, 526 (2d Cir. 2011)).

**1. Barclays Fails to Identify which, if any, Arbitration Agreement Plaintiff Consented To.**

The United States Supreme Court has made clear repeatedly, "Arbitration is a matter of contract and consent, and we have long held that disputes are subject to arbitration if, and only if, the parties actually agreed to arbitrate those disputes." *Coinbase, Inc. v. Suski*, 144 S. Ct. 1186, 1191 (2024). Further, in affirming the denial of a motion to compel arbitration by one of Barclays' banking competitors, the Second Circuit recently held that "[i]t is a basic tenet of contract law that, in order [for an arbitration provision] to be binding, a contract requires a meeting of the minds and a manifestation of mutual assent." *Lipsett*, 2024 WL 111247, at *1 (affirming denial of a motion to compel arbitration and requiring claims to be heard in a court of law). Here, Barclays fails to bear its threshold burden of showing that a binding contract containing an arbitration agreement was formed between Plaintiff and Barclays. Accordingly, its motion to compel arbitration must be denied.

Barclays asserts that all account-holders accept the customer agreements containing arbitration provisions by using their card. Beauchamp Decl., Ex. A at 2; Ex. D at 5; Ex. F at 5. However, Barclays provides no evidence demonstrating *when* or *how* Plaintiff agreed to any arbitration provision other than that Plaintiff used his credit card, so he is bound. This argument is flawed, and fatally so.

Barclays admits that earlier versions of its agreements did not include the same arbitration provisions, yet it has failed to establish that Plaintiff is bound by a later version containing such a clause. Barclays' failure to identify which, if any, arbitration agreement Plaintiff consented to highlights its argument's fundamental flaw.

Moreover, Barclays' own procedures undermine its assertion that Plaintiff agreed to arbitration. Barclays uses the "Card Mailer" system, in which it mails newly approved credit cards

to customers along with the customer agreement containing the contractual terms. Beauchamp Decl. ¶ 8. Barclays contends that this practice was followed for Plaintiff's Barclays View, Upromise, and JetBlue accounts. *Id.* ¶¶ 9-10, 19-20, 27-28. However, the agreements sent with these mailers included provisions allowing Barclays to amend the agreement at any time, rendering any purported acceptance by Plaintiff invalid. Beauchamp Decl., Ex. D at 5; Ex. F at 5.

Barclays further claims that in 2013 and again in 2024, it issued amendments to the arbitration provision in Plaintiff's agreements via mailed notices and electronic statements. Beauchamp Decl. ¶¶ 14, 16, 24, 32. However, Barclays fails to show that Plaintiff ever expressly agreed to these changes. Instead, the modifications were unilaterally imposed, with Barclays relying on Plaintiff's continued use of the account as assent. Barclays' practices fail to constitute proper notice and acceptance because agreements must be "reasonably communicated to the user." *Lipsett,* 2024 WL 111247, at *1.

*Lipsett* is on point here and governs. In *Lipsett*, the Second Circuit found that an arbitration provision could not bind an account-holder where the notice was ambiguous and failed to provide clear instructions on how to opt out. *Lipsett,* 2024 WL 111247, at **1-2. Similarly, here, Barclays' failure to establish that Plaintiff received adequate notice of an arbitration provision and an affirmative agreement is reason to deny its Motion. Accordingly, pursuant to the governing authority of *Lipsett*, Defendant's Motion must be denied.

**2. Under *Lipsett v. Popular Bank*, "continued account use" alone does not constitute a binding agreement.**

As outlined in detail in Part A, Barclays fails to present ***admissible*** evidence that the purported agreements were sent to, received by, and agreed to by Plaintiff. This basic evidentiary failure is sufficient to deny the Motion. But, even if, *arguendo*, the Court finds Barclays actually

sent an arbitration agreement, this Court should follow the reasoning in *Lipsett* and deny Barclays' Motion because Barclays failed to establish that Plaintiff clearly assented to arbitration.

In *Lipsett*, the Second Circuit rejected the argument that continued account use alone, which Defendant raises here, is sufficient to establish assent where the arbitration terms were unclear. Specifically, the Second Circuit found that the defendant bank's notice was misleading because it suggested there was an existing arbitration provision when none had previously applied. This language, the Second Circuit held, "renders the arbitration provision less conspicuous" and prevents a reasonable customer from understanding the terms to which they are purportedly bound. *Lipsett*, 2024 WL 111247, at *2. The Second Circuit also found that conflicting opt-out provisions in different versions of the agreement rendered it unreasonable to conclude that a customer could clearly understand their ability to reject arbitration. *Id.*

Here, Barclays fails to prove that Plaintiff was ever provided with a clear and conspicuous arbitration agreement or given a meaningful opportunity to reject it. Barclays has not produced an agreement or other evidence demonstrating that Plaintiff received notice of an arbitration clause and affirmatively assented to it. Instead, Barclays argues that Plaintiff "must have" received the revised agreements since notice of the document's availability on the website itself – *not even the document* - was sent via email and that Plaintiff's subsequent login to his account constitutes assent. However, the Second Circuit in *Lipsett* held that "impenetrable vagueness and uncertainty will not do" in forming an enforceable contract. 2024 WL 111247, at *1 (quoting *Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher*, 52 N.Y.2d 105, 109 (1981)

But even examining the website it is apparent that the controlling terms were unclear. The Upromise webpage from 2015 does not contain an arbitration provision. Rather, in a footnote at the bottom of the page it states, in part, "For information about rates, fees, other costs, the reward

program rules (including points accrual rate, points awards, etc.) and benefits associated with the use of the credit card program, please see the Terms and Conditions." Moore Decl. Ex. 3. Making matters worse, the Terms and Conditions from that link also do not discuss any arbitration provision. *See* Moore Decl. Ex. 4.

Similarly, the JetBlue webpage from 2017—the oldest version available to Plaintiff—states in a footnote at the bottom of the page "Please see Terms and Conditions for more information about rates, fees, costs, and terms for this particular offer before applying." Moore Decl. Ex. 5. Once again, the Terms and Conditions do not mention arbitration. Moore Decl. Ex. 6.

Additionally, Barclays' process for providing arbitration agreements further highlights its failure to show Plaintiff's assent. When Plaintiff first received his Barclays credit cards, he was sent a "Card Mailer" containing the card and original Cardmember Agreement, which stated that using the card constituted acceptance. Beauchamp Decl. ¶ 8. However, Barclays retained the ability to amend this agreement unilaterally, merely providing notice of changes. In January 2013, Barclays sent Plaintiff an amended arbitration provision that significantly altered dispute resolution terms without requiring his active agreement. Similar unilateral amendments followed in 2024, when Barclays issued "Notice About Changes" documents via electronic statements and emails, stating that updated terms were available online. *Id.* ¶¶ 16, 24, 32. Barclays argues that Plaintiff's subsequent login constituted assent, but *Lipsett* establishes that ambiguous and passive assent is insufficient for a binding arbitration agreement. 2024 WL 111247, at *1. Barclays' failure to obtain affirmative consent and reliance on unilateral modifications further supports Plaintiff's argument that no valid arbitration agreement exists.

Finally, as in *Lipsett*, Barclays has not shown that Plaintiff had a reasonable means to opt out of arbitration. *Lipsett* emphasized that "[a] reasonable customer would not be sufficiently

aware of which of these opt-out provisions governs" when a bank provides unclear or conflicting information. *Lipsett*, 2024 WL 111247, at *2. Barclays' failure to present an unambiguous and enforceable agreement governing Plaintiff's account mirrors this issue. Barclays has repeatedly made changes to its agreements while failing to provide Plaintiff with clear notice of modifications, the specific terms that have changed, and the methods by which he could accept or decline them. Given the inadequate means of notification, it would be unreasonable to conclude that Plaintiff had sufficient knowledge to make an informed decision regarding arbitration.

Since Barclays has not met its burden to show the existence of a binding arbitration agreement, the Court should deny its motion to compel arbitration, consistent with the Second Circuit's governing authority of *Lipsett*.

### C. The GBL § 349 Claim is Unenforceable under the Effective Vindication Doctrine and the Poison Pill Provision.

Even if, *arguendo*, the Court were to look past these insurmountable formation issues and find proper notice and assent were given, the agreements are unenforceable under the effective vindication doctrine.[1]

#### 1. The Court has Jurisdiction to Rule on the Effective Vindication Doctrine.

"[A]rbitrability questions are presumptively to be decided by the courts, not the arbitrators themselves." *Telenor Mobile Comms. AS v. Storm LLC*, 584 F.3d 396, 406 (2d Cir. 2009). This "presumption can be rebutted only by 'clear and unmistakable evidence from the arbitration agreement, as construed by the relevant state law, that the parties intended that the question of arbitrability shall be decided by the arbitrator.'" *Id.* (citation omitted).

The terms put forward by Barclays state unequivocally, "[a]ll issues shall be for the arbitrator to decide ***except*** issues related to the scope, enforceability, interpretation, or formation

[1] The effective vindication doctrine is sometimes referred to as the "prospective waiver" doctrine.

of this arbitration agreement, which shall be for the court to decide." *See* Beauchamp, Ex. C, ECF No. 69-3, at 9 (emphasis added).[2] The terms also state, "[i]n the event that there is a dispute about whether limiting arbitration of the parties' dispute to non-class proceeding is enforceable under applicable law, then that question shall be resolved by litigation in a court rather than by the arbitrator[.]" *Id.* at 10.

Thus, under both the general presumption and the terms, the Court must determine whether the effective vindication doctrine applies.

### 2. Effective Vindication Doctrine Renders the Clause Unenforceable

#### *a. <u>Application of the Effective Vindication Doctrine to the Present Dispute</u>*

As stated by the Second Circuit,

> Although the FAA provides for the enforcement of arbitration agreements, *see* 9 U.S.C. §§ 2–4, there are exceptions to that general rule. Developed by the Supreme Court, the "effective vindication" doctrine is a judge-made exception to the FAA that invalidates, "on public policy grounds, arbitration agreements that operate as a prospective waiver of a party's right to pursue statutory remedies."

*State Farm Mut. Auto. Ins. Co. v. Tri-Borough NY Medical Prac. P.C.*, 120 4th 59, 89 (2d Cir. 2024) (quoting *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 235 (2013)).

In *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, the Supreme Court explained that "[b]y agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial,

---

[2] Defendant cites to three sets of agreements to support its Motion. All three sets suffer from the same formation issues. However, for purposes of this section, Plaintiff will presume the Court disagreed with him, and found the agreements were formed. The most recent version from each set of agreements is substantively identical for purposes of the arbitration provision. *See* Bauchamp, Exs. C, E, and G. To avoid duplicative citations and confusion, Plaintiff will cite to Exhibit C, but the arguments and positions apply with equal force to Exhibits E and G. For purposes of Part C, Plaintiff incorporates by reference Exhibits E and G into each citation to Exhibit C.

forum." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 628 (1985). In *Viking River Cruises, Inc. v. Moriana*, the Supreme Court reiterated:

> Moriana is correct that the FAA does not require courts to enforce contractual waivers of substantive rights and remedies. The FAA's mandate is to enforce "*arbitration agreements*." And as we have described it, an arbitration agreement is "a specialized kind of forum-selection clause that posits not only the situs of suit but also the procedure to be used in resolving the dispute." An arbitration agreement thus does not alter or abridge substantive rights; it merely changes how those rights will be processed. And so we have said that " '[b]y agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral ... forum.' "

*Id.*, 596 U.S. 639, 653 (2022) (citations omitted).

Notably, "the policy favoring enforcement of agreements *to arbitrate* does not automatically extend to enforcement of *any* provision within an arbitration agreement." *Cedeno v. Sasson*, 100 F.4th 386, 395 (2d Cir. 2024) (citing *Viking River*, 596 U.S. at 653 n.5). In *Viking River*,

> The [Supreme] Court explained that the basis of the principle that the FAA does not mandate enforcement of waivers of substantive rights is "that the FAA requires only the enforcement of 'provisions' to settle a controversy 'by arbitration,' and not any provision that happens to appear in a contract that features an arbitration clause."

*Cedeno*, 100 F.4th at 395 (quoting *Viking River*, 596 U.S. at 653 n.5)

As Justice Kagan pointed out in her dissent in *Italian Colors*,

> [The FAA] reflects a federal policy favoring actual arbitration—that is, arbitration as a streamlined "method of resolving disputes," not as a foolproof way of killing off valid claims. Put otherwise: What the FAA prefers to litigation is arbitration, not *de facto* immunity. The effective-vindication rule furthers the statute's goals by ensuring that arbitration remains a real, not faux, method of dispute resolution. With the rule, companies have good reason to adopt arbitral procedures that facilitate efficient and accurate handling of complaints. Without it, companies have every incentive to draft their agreements to extract backdoor waivers of statutory rights, making arbitration unavailable or pointless.

*Italian Colors*, 570 U.S. at 243-44 (citation omitted).

Even if a clause appears "neutral" on its face, if it has "the effect of prospectively waiving a party's statutory remedies," it is unenforceable. *Cedeno*, 100 4th at 395; *Gringras v. Think Finance, Inc*, 922 F.3d 112, 127 (2d Cir. 2019) ("The arbitration mechanism in these agreements purports to offer neutral dispute resolution but appears to disallow claims brought under federal and state law"); *State Farm Mut.* 120 4th at 91 ("Although the *terms* of the arbitration agreement here do not expressly prohibit State Farm from bringing federal statutory claims, enforcement of the agreement would have the *effect* of preventing State Farm from effectively vindicating its RICO claims given the unusual circumstances in this case").

In applying these principles, in *Gringras,* the agreement called for the application of tribal law. *Gringras*, 922 F.3d at 118 ("One such provision is a delegation clause whereby the parties agree that 'any Dispute ... will be resolved by arbitration in accordance with Chippewa Cree tribal law'"). The Second Circuit "conclude[d] that the arbitration agreements are unenforceable because they are designed to avoid federal and state consumer protection laws." *Id.* at 127. The Court reasoned, in part:

> By applying tribal law only, arbitration for the Plain Green borrowers appears wholly to foreclose them from vindicating rights granted by federal and state law. We agree with the Fourth Circuit that "[t]he just and efficient system of arbitration intended by Congress when it passed the FAA may not play host to this sort of farce."

*Id.* (quoting *Hayes v. Delbert Serv. Corp.*, 811 F.3d 666, 674 (4th Cir. 2016).

Similarly, in *Cedeno*, the clause

> . . . require[d] claimants like Cedeno to bring their claims solely in their "individual capacity and not in a representative capacity," and prohibits them from seeking or receiving "any remedy that has the purpose or effect of providing additional benefits or monetary or other relief to any Employee, Participant or Beneficiary other than the Claimant."

*Cedeno*, 100 F.4th at 400.

The Second Circuit concluded that "[t]hese restrictions effectively preclude Cedeno from pursuing the remedies available to him under Section 502(a)(2) for Defendants' violations of their obligations under Section 409(a)." *Id.* Specifically, "[t]hough Section 409(a) codifies fiduciary duties that protect a plan as a whole, as well as holders of individual accounts within the plan, the Section 502(a)(2) vehicle for enforcing Section 409(a) provides for only plan-wide remedies." *Id.* Thus, "[i]f Sections 17.10(f) and (g) prevent Cedeno from pursuing the statutory plan-wide remedies available under Section 502(a)(2), then they effectively prevent him from vindicating his substantive statutory rights under Section 409(a) and remedies under Section 502(a)(2)." *Id.* at 400-01.

The Seventh Circuit reached a similar conclusion in *Smith v. Board of Directors of Triad Manufacturing*, 13 F.4th 613, 621 (7th Cir. 2021). Per *Smith*:

> Recall that Smith invokes § 1132(a)(2)'s cause of action to seek relief for (alleged) fiduciary breaches under § 1109(a). That relief, by statute, includes "such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary." 29 U.S.C. § 1109(a). Yet the plan's arbitration provision, which also contains a class action waiver, precludes a participant from seeking or receiving relief that "has the purpose or effect of providing additional benefits or monetary or other relief to any Eligible Employee, Participant or Beneficiary other than the Claimant." Removal of a fiduciary—a remedy expressly contemplated by § 1109(a)—would go beyond just Smith and extend to the entire plan, falling exactly within the ambit of relief forbidden under the plan.

*Id.*

To this end, the *Smith* court noted, "[a]ll this is to say that the plain text of § 1109(a) and the terms of the arbitration provision cannot be reconciled: what the statute permits, the plan precludes. In that way, the plan's arbitration provision acts as a 'prospective waiver of a party's right to pursue statutory remedies.'" *Id.* (quoting *Mitsubishi Motors*, 473 U.S. at 637 n.19).

Here, Plaintiff brings a claim under New York General Business Law ("GBL") § 349. *See* Compl. §§ 131-138. Per GBL § 349(h), "any person who has been injured by reason of any

violation of this section may bring an action in his own name to enjoin such unlawful act or practice[.]" Plaintiff seeks injunctive relief under this section. *See* Compl. § 138; *see also* Prayer for Relief D. The contours of that relief are properly pleaded in Plaintiff's request for declaratory relief where he seeks "prospective injunctive relief requiring Defendant to keep its nonpublic personal information, including personally identifiable financial information, confidential consistent with law and industry standards." Compl. ¶ 105.

The only meaningful injunctive relief Plaintiff could seek is "removing the Facebook Tracking Pixel and any similar tracking technologies from [Defendant's] website." Compl. ¶ 107. This is because the Meta Pixel works automatically when a consumer visits the website. *See* Compl. ¶ 19. But such relief inherently affects *all* website users and is therefore barred by the Terms.

Specifically, the Terms state:

> You and we agree that all Claims must be arbitrated on an individual basis between you and us, and not on a class, representative, or any other kind of collective basis. As a result, class actions and other representative or collective basis proceedings are not available for resolution of Claims. Apart from Claims arising from the same Account, no claims may be joined together in the arbitration. The arbitrator shall not have any authority to entertain a claim, or to award any relief, on behalf of or against anyone other than a named party to the arbitration proceeding.

Ex. C at 9. (the "Offending Language").

The Offending Language tracks the language found to be violative in *Cedeno*. *Compare with Cedeno*, 100 F.4th at 400 ("individual capacity and not in a representative capacity," and "any remedy that has the purpose or effect of providing additional benefits or monetary or other relief to any Employee, Participant or Beneficiary other than the Claimant").

Because injunctive relief affects the website and, therefore, all users, it is barred by the Offending Language's mandate that "[t]he arbitrator shall not have any authority to entertain a

claim, or to award any relief, on behalf of or against anyone other than a named party to the arbitration proceeding."

Equally, because the injunction would affect the website and thus is "an individual injunction benefiting all its members at once," such an injunction falls under the ambit of a Rule 23(b)(2) class. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 362-63 (2011). By barring relief that affects other users and the class mechanism, the terms likewise bar Plaintiff from obtaining injunctive relief. As such, all of the Offending Language, including the prohibition on proceeding as a class, effectively bars Plaintiff from obtaining injunctive relief under GBL § 349.

To be clear, Plaintiff "is not asserting a free-floating right to proceed through collective action for its own sake; he is asserting a right to pursue the full range of statutory remedies to enforce his *substantive* statutory rights under [GBL § 349]." *Cedeno*, 100 4th at 386. The terms "do not simply take off the table the means to secure a claimant's statutory rights and remedies through collective action, while leaving intact an alternative path through individual arbitration." *Id.* As explained above, "these provisions, if enforced, would leave claimants like Plaintiff without *any* means of securing the full range of statutory remedies available to him." *Id.*

> That fact distinguishes this case from the line of authority [Barclays may] rely upon. For example, in *Epic Systems*, in the context of claims against employers under the Fair Labor Standards Act, the Supreme Court upheld an arbitration agreement that required "individualized arbitration." 138 S. Ct. at 1620. Nothing in the *Epic Systems* decision suggests that the "individualized arbitration" provision had the effect of waiving any party's substantive statutory rights and remedies. *Id.* at 1628. Similarly, in *Italian Colors*, the Court enforced a contractual waiver of class arbitration in the context of a merchant's antitrust action against American Express. 570 U.S. at 239, 133 S.Ct. 2304. The merchant argued that the high cost of pursuing such a claim on an individualized basis precluded it from vindicating its rights. *Id.* at 231, 133 S.Ct. 2304. The Supreme Court disagreed, emphasizing that the class-action waiver "no more eliminates [the] parties' right[s] to pursue their statutory remedy than did federal law before its adoption of the class action for legal relief in 1938." *Id.* at 236, 133 S.Ct. 2304 (citations omitted). As in *Epic Systems* and the other cases [Barclays may] rely on, in *Italian Colors* the restrictive arbitration

> provisions did not effectively eliminate the merchant's substantive rights and remedies.

*Id.* at 401-02.

Similar to the clauses in *Cedeno* and *Smith*, which limited the relief that the claimants could receive to just the claimants, thereby preventing them from vindicating all of their statutory rights, the Offending Language has the effect of waiving Plaintiff's right to seek injunctive relief under GBL § 349. Thus, Offending Language is unenforceable under the effective vindication doctrine.

*b. The Effective Vindication Doctrine Applies to State Statutory Rights*

The effective vindication doctrine applies to both federal and state statutory rights. In *Viking River*, the defendant argued the "rule applies only to waiver of 'federal statutory right[s],' not state-law ones." *Viking River*, Reply Brief, 2022 WL 839398, at *6 n.1. But the Supreme Court rejected this argument, stating:

> In briefing before this Court, Viking argued that the principle that the FAA does not mandate enforcement of provisions waiving substantive rights is limited to federal statutes. This argument is erroneous. The basis of this principle is not anything unique about federal statutes. It is that the FAA requires only the enforcement of "provision[s]" to settle a controversy "by arbitration," § 2, and not any provision that happens to appear in a contract that features an arbitration clause. That is why we mentioned this principle in *Preston*, which concerned claims arising under state law. See 552 U.S. at 360, 128 S.Ct. 978 (noting that under the agreement, a party "relinquishe[d] no substantive rights ... California law may accord him").

*Viking River*, 596 U.S. at 653 n.5 (citing *Preston v. Ferrer*, 552 U.S. 346, 360 (2008)).

Since this ruling, at least three district courts have followed the Supreme Court's direction and squarely rejected the argument that the effective vindication doctrine does not apply to state statutes. *See, e.g., Fahy v. Minto Devel. Corp.*, 722 F.Supp.3d 784, 803-04 (N.D. Ill. 2024) ("This Court finds no reason to discount the Supreme Court's express rejection of the defendant's argument in *Viking River Cruises, Inc.*"); *Fitzgerald v. Wildcat*, 687 F.Supp. 3d 756, (W.D. Va. 2023) ("Thus, based on the reasoning underlying Fourth Circuit and Supreme Court precedent, an

arbitration agreement prospectively waiving all state substantive rights and remedies can be found unenforceable for violating public policy"); *Harris v. W6LS, Inc.*, 2024 WL 2319716, at *5 (N.D. Ill. May 22, 2024) ("Footnote 5 makes a distinct point, that the prospective waiver principle applies to state as well as federal substantive rights").

And while there are cases that hold otherwise, they pre-date or rely on cases that pre-date *Viking River*. On this, the *Harris* court perfectly addressed the issue:

> The pre-*Viking River* cases that do expressly discuss whether the prospective waiver doctrine applies to state substantive rights rely on the *Italian Colors* dissent. *See Torres v. CleanNet, U.S.A., Inc.*, 90 F. Supp. 3d 369, 377– 78 (E.D. Pa. 2015); *see also Ferguson v. Corinthian Colls., Inc.*, 733 F.3d 928, 935–36 (9th Cir. 2013) (not cited by Defendants but relying on the *Italian Colors* dissent for the same point). But because these decisions predated *Viking River*, they necessarily could not explain how following the *Italian Colors* dissent is consistent with the *Viking River* majority. Perhaps the *Italian Colors* dissent was the most persuasive authority available on the question of whether the doctrine applies to state rights at the time, and nothing in the *Italian Colors* majority expressly contracts the dissent's view. That is no longer the case post-*Viking River*, however, so these decisions' persuasive value is minimal.

*Harris*, 2024 WL 2319716, at *6; *see also Fahy*, 722 F.Supp.3d at 803 ("The only case the defendants cite in support of their argument here was decided before *Viking River Cruises, Inc.*, and multiple federal courts that have considered the issue both pre- and post-*Viking River Cruises, Inc.* have concluded that the prospective waiver doctrine also applies to waivers of state rights and remedies").

To this end, as the *Harris* court pointed out,

> The Supreme Court's reasoning is "just as binding" as its holdings. *Bucklew v. Precythe*, 587 U.S. 119, 136 (2019). Footnote 5 appeared in a discussion of why the arbitration agreement was enforceable, and its reasoning—explaining that *Preston* (and implicitly *Mitsubishi*) do not distinguish between federal and state sources of substantive rights—speaks for a majority of the Supreme Court. 596 U.S. at 653 & n.5. Even if the footnote was technically unnecessary to the *Viking River* decision, it is telling that the majority expressly stated that "[t]he basis of this principle is not anything unique about federal statutes," 596 U.S. at 653 n.5, rather than reserving the question, as the Supreme Court often does.

*Harris*, 2024 WL 2319716, at *6.

Although the Second Circuit often discusses the effective vindication doctrine as applying to federal statutory rights, it has never held that it does not apply to state law statutory rights. To the contrary, in *Gingras*, the Second Circuit repeatedly stated that the offending language would "foreclose [the borrowers] from vindicating rights granted by federal and state law." *Gingras*, 922 F.3d at 127. Equally, in *Cedeno*, the Second Circuit quoted favorably the language from *Viking River* footnote 5. *See Cedeno*, 100 F.4th at 395 (quoting *Viking River*, 596 U.S. at 653 n.5).

Thus, under the very persuasive precedent in *Viking River*, *Gingras*, and *Cedeno*, as well as the very well-reasoned decisions in *Fahy*, *Fitzgerald*, and *Harris*, the Court should hold the effective vindication doctrine applies to Plaintiff's GBL § 349 claims, and renders the Offending Language unenforceable.

**3. The Poison Pill Provision Ends the Motion to Compel Arbitration**

Per the terms, "to the extent it is determined that resolution of a Claim shall proceed on a class basis, it shall so proceed in a court of competent jurisdiction rather than in arbitration." Ex. C at 10. This is what is referred to as a "poison pill," that is, a clause that renders the claim nonarbitrable upon a finding that part of the class waiver is unenforceable. *See McArdle v. AT&T Mobility LLC*, 2017 WL 4354998, at *4-5 (N.D. Cal. Oct. 2, 2017) *affirmed* 772 F. App'x 575 (9th Cir. 2019) (clause stating "If this specific provision is found to be unenforceable, then the entirety of this arbitration provision shall be null and void"); *see also Jack v. Ring LLC*, 91 Cal.App.5th 1186, 1209 (2023) (clause stating "If a court decides that applicable law precludes enforcement of any of this subsection's limitations as to a particular claim for relief, then that claim (and only that claim) must be severed from the arbitration and may be brought in court").

As discussed above, the Offending Language is unenforceable, and with it, the prohibition against class proceedings. Per the poison pill, that claim shall proceed in the Court of law. Thus, the GBL § 349 claim must proceed in this Court.

Moreover, the Court is not free to re-write the agreement's language based on a public policy. *See Morgan.*, 596 U.S. at 418 ("The policy is to make 'arbitration agreements as enforceable as other contracts, but not more so.' . . . But a court may not devise novel rules to favor arbitration over litigation"); *PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1199 (2d Cir. 1996) ("Rather than rewrite an unambiguous agreement, a court should enforce the plain meaning of that agreement"); *Duran v. EmployBridge Holding Co.*, (2023) 92 Cal. App.5th 59, 66 ("the policy favoring arbitration does not override an agreement's clear language and create an ambiguity where none exists").

Further, as both the Supreme Court and Second Circuit have stated, "the common-law rule of contract interpretation that 'a court should construe ambiguous language against the interest of the party that drafted it' applies in interpreting arbitration agreements." *PaineWebber, Inc.*, 81 F.3d at 1199 (quoting *Mastrobuono v. Sherson Lehman Hutton, Inc.*, 514 U.S. 52, 62 (1995)). Barclays "drafted an ambiguous document, and they cannot now claim the benefit of the doubt. The reason for this rule is to protect the party who did not choose the language from an unintended or unfair result." *Mastrobuono*, 514 U.S. at 63.

## IV. <u>CONCLUSION</u>

For the reasons stated above, Plaintiff respectfully requests that the Court deny Barclays' Motion to Compel Arbitration.

Dated: March 14, 2025

Respectfully submitted,

*/s/ Charles D. Moore*
**REESE LLP**
121 N. Washington Ave., 2nd Floor
Minneapolis, MN 55401
T: (212) 643-0500
cmoore@reesellp.com

**REESE LLP**
Michael R. Reese
**REESE LLP**
100 West 93rd Street, 16th Floor
New York, NY 10025
T: (212) 643-0500
mreese@reesellp.com

Kevin Laukaitis*
**LAUKAITIS LAW LLC**
954 Avenida Ponce De Leon
Suite 205, #10518
San Juan, PR 00907
T: (215) 789-4462
klaukaitis@laukaitislaw.com
**Pro Hac Vice* Application forthcoming

*Counsel for Plaintiff and the Proposed Class*

**CERTIFICATE OF COMPLIANCE**

I hereby certify pursuant to Local Rule 7.1(c) and Your Honor's Individual Rule III.B.1 that the Memorandum of Law in Support of Plaintiff's Response in Opposition to Defendant's Motion to Compel Arbitration uses a proportionally spaced, Times New Roman typeface of 12 points and contains 8,674 words, as counted by the Microsoft Word processing system used to produce this brief.

Date: March 14, 2025 Respectfully submitted,

**REESE LLP**
*/s/ Charles D. Moore*
Charles D. Moore
121 N. Washington Ave, 2nd Floor
Minneapolis, MN 55401
(212) 643-0500

D